**In re Amy FELD, Debtor.**

**AT & T UNIVERSAL CARD SERVICES CORP., Plaintiff,**

**v.**

**Amy FELD, Debtor.**

**Bankruptcy No. 95–16748DWS.
Adversary No. 95–0889.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 18, 1996.

Ronald Beifeld, Norristown, PA, for Debtor.

Melvyn S. Mantz, Doylestown, PA, for Plaintiff.

Joseph Minni, United States Trustee, Philadelphia, PA.

### *OPINION*

DIANE WEISS SIGMUND, Bankruptcy Judge.

### INTRODUCTION

The plaintiff in the instant adversary proceeding, AT & T Universal Card Services, Corp. ("AT & T"), seeks to have a credit card debt declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), the fraud exception. At issue is a debt in the amount of $8,195.48 resulting primarily from cash advances taken by the debtor Amy Feld ("Debtor") on plaintiff's credit card. We find that the debt is dischargeable.

■ As recently articulated by the United States Supreme Court in *Field v. Mans*, —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), the issue of dischargeability under § 523(a)(2)(A) is measured by the standards traditionally associated with an action for fraudulent misrepresentation under common law. Under these standards, a plaintiff must establish that it relied to its detriment on a misrepresentation that was intentionally false. In this case, the Debtor in using her credit card represented to AT & T that she intended to repay the money she borrowed. Based on an evaluation of all the circumstances, however, including the Debtor's credibility as a witness, the Debtor's representations were more likely to be false than true. Nevertheless, because AT & T presented no evidence that it relied on the Debtor's representations to any extent, its cause must fail.

### BACKGROUND

Debtor, aged 32, received a Bachelors degree from Marywood College in 1985 and more recently, in 1995, earned a Masters Degree in social work at Widener University. Following college, and until 1990, Debtor worked as a department manager at Bloomingdales. In 1990, Debtor ceased working, was certified as disabled and began receiving social security disability benefits. According to Debtor, her disability was caused by mental and emotional illness. She stated that she has received various diagnoses including depression, anxiety, post-traumatic stress and that she had suicidal thoughts. Debtor began studying for her Masters Degree part-time in 1992. She testified that she initially looked forward to working full-time following graduation from Widener, but these plans never came to fruition due to continuing illness. Starting in 1994, she began feeling fatigued, leading to a diagnosis the following year of chronic fatigue syndrome. Combined with her other ailments, the chronic fatigue has prevented Debtor from trying to achieve full-time employment.

Before and after graduating from Widener, Debtor relied primarily upon social security benefits for support although she supplemented her income by working part-time as a counselor. Debtor indicated in Schedule "I" of her petition that her income from social security was $866 per month for 1995, augmented by about $200 net income each month which she earned as an independent contractor working part-time as a counselor at the Norristown Life Center. Exhibit P–5. In 1993 and 1994, her income was $9,000 and $9,500, respectively. Exhibit P–7. During the summer of 1996, she was recertified to receive security disability benefits into the future.

On the subject of credit cards, Debtor stated that she had several of them and that she rotated their use. Other than some small medical bills, the bulk of her $17,350.62 scheduled unsecured claims is on account of credit card debt. Exhibit P–6. She obtained her AT & T card at an unknown date sometime prior to 1995. The circumstances surrounding her securing the card were not revealed. Thus, we do not know if the card was solicited or unsolicited and what credit information was given to AT & T to qualify for the credit extension. Debtor did acknowledge requesting the convenience checks she used to secure certain of the cash advances. The sole evidence of the circumstances surrounding issuance of the card is an unsigned, undated form AT & T Cardmember Agreement, Exhibit P–1, and Debtor's admission that she agreed to be bound

by the terms and conditions of the cardholder agreement although she could not recall what they were.

The card issued to Debtor had a credit limit of $7,700. As of the June statement, the balance was $514 stemming from a single cash advance in the amount of $500 taken on May 26. Exhibit P-2. The charges that prompted AT & T to file the instant adversary proceeding all took place within the following two months. The Debtor's next statement showed five transactions taking place between June 19 and July 10 aggregating $6,595 and consisting of three large cash advances and two small charges. Exhibit P-3. The first cash advance was for $1,000 and was taken on June 19 at Progress Federal Bank in Jeffersonville. When AT & T's counsel questioned Ms. Feld regarding her use of this money, she indicated that she did not remember. On July 3, Ms. Feld made out a convenience check to herself in the amount of $4,000. When asked to identify her use of this money, Ms. Feld testified that she was not entirely certain but thought she may have used the money to pay a debt owed to her psychiatrist. On July 10, Ms. Feld took out a third cash advance, also in the form of a convenience check, for $1,500. This check, however, was made out directly to her psychiatrist. Finally, the credit card statement shows two small charges, one on June 27 for $66 and the second on July 6 for $29. Ms. Feld's next statement shows that between July 18 to 26 she used seven more convenience checks totaling $660 and incurred one charge for $64.50. Exhibit P-4. Combined with the finance charge, these transactions placed the Debtor's balance in excess of $300 over her credit limit.

Debtor filed a Chapter 7 bankruptcy on September 1, 1995, just slightly one month after her final cash advance. Debtor indicated that she contacted an attorney in August after first seeking advice from a consumer credit counseling agency which informed her that bankruptcy might be her best option and that she should seek the advice of legal counsel. On December 1, 1995, AT & T filed its complaint objecting to discharge, contending that Debtor had the intent to defraud AT & T in the use of her credit card account. Trial was held on September 24, 1996.[1]

## DISCUSSION

### I.

AT & T requests that Ms. Feld's debt to it be declared nondischargeable based on 11 U.S.C. § 523(a)(2)(A)[2] which states:

> (a) A discharge under section 727 … does not discharge an individual debtor from any debt—
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A). The language in subsection (A) has its origins in the Bankruptcy Act of 1898 and is interpreted to encompass acts of fraudulent misrepresentation involving moral turpitude or intentional wrong. 3 Collier on Bankruptcy ¶ 523.08[4] (Lawrence J. King, ed., 15th ed. 1996) ["Collier"].[3]

■■■■ As with all exceptions to discharge, § 523(a)(2)(A) should be interpreted narrow-

---

1. AT & T did not present any witnesses in support of its case. Instead, AT & T's counsel read certain admissions into the record and moved several documents into evidence, including the three credit card statements mentioned above, the Debtor's Schedule "F," Statement of Financial Affairs, and the AT & T Cardmember Agreement. The admissions were very general, and did not add anything to or contradict the Debtor's testimony. AT & T rested upon presentation of this evidence. The Debtor testified in her own defense.

2. In neither the Complaint nor the Joint Pretrial Statement, which pursuant to this Court's Sec-

ond Pretrial Order dated May 17, 1996 governed the trial of this matter, does AT & T raise the presumption that any part of the debt was nondischargeable pursuant to § 523(a)(2)(C). As AT & T did not invoke the presumption of nondischargeability contained in § 523(a)(2)(C), we will not address that provision in this Opinion.

3. The term "actual fraud" was added to the statute by the Bankruptcy Reform Act of 1978. However, the new language is generally regarded as a clarification of the statute, not a change. *Id.* ¶ 523.08(8)[5].

ly in favor of the debtor. *United States v. Stelweck,* 108 B.R. 488, 495 (E.D.Pa.1989); *Griffith, Strickler, Lerman, Solymos & Calkins (In re Taylor),* 195 B.R. 624, 627 (Bankr.M.D.Pa.1996). As the party objecting to discharge, AT & T must prove all of the elements of fraud by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 289–88, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755 (1991).

An overriding goal of bankruptcy is to provide debtors a fresh start so they may begin life anew free from the pressure and discouragement of unmanageable indebtedness. *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934). Section 523(a)(2)(A), however, represents a policy determination that the goal of providing debtors a fresh start must yield to the protection of creditors against fraud. Fundamentally, the section seeks to prevent debtors from incurring debt with the intention of not paying by obtaining a discharge in bankruptcy. Although the concept behind the section appears simple enough, the application of the exception in the context of credit cards has been fraught with doctrinal difficulty. Differences exist respecting how to judge a debtor's intent, what if anything a debtor represents by using a credit card, and how a credit card lender relies on a debtor's representations when extending credit.

### A.

The Supreme Court recently acted to clarify the standards applicable to § 523(a)(2)(A) in *Field v. Mans,* albeit in a context other than use of a credit card. Its analysis is instructive in resolving the case *sub judice.* In *Field,* the Court held that § 523(a)(2)(A) encompasses the common law tort action of fraudulent misrepresentation, reasoning that words of art employed by Congress when drafting the statute should be accorded their accepted meaning. The Court identified the elements of fraud to be applied based on the Restatement of Torts and a leading treatise, Prossor's Law of Torts, recognizing that these sources represent a distillation of the common law applied by the states generally. —— U.S. at ——, 116 S.Ct. at 444.

Following this same approach, we note that Prossor lists the elements of fraud as follows:

1. A false representation made by the defendant. In the ordinary case, this representation must be one of fact.

2. Knowledge or belief on the part of the defendant that the representation is false—or, what is regarded as equivalent, that he has not a sufficient basis of information to make it. This element often is given the technical name "scienter."

3. An intention to induce the plaintiff to act or to refrain from action in reliance upon the misrepresentation.

4. Justifiable reliance upon the representation on the part of the plaintiff, in taking action or refraining from it.

5. Damage to the plaintiff as a proximate result of the representations having been made.

W. Page Keeton, Dan B. Dobbs, Robert E. Keeton, David G. Owen, The Law of Torts 728 (5th ed. 1984) ["Prosser"]. Prior to the decision in *Field v. Mans,* which clarified that the reliance required was justifiable, many courts had established a more stringent test of reasonable reliance.

*Field v. Mans* also effectively ended the long running dispute concerning the use of an objective verses subjective standard to determine whether a debtor has an intent to deceive, recognizing that under the common law a subjective standard prevailed. Restatement (Second) Torts § 526, comment d; *see id.* § 530 (statement of intention is fraudulent when maker does not actually possess the intent stated). *See Chase Manhattan Bank v. Murphy (In re Murphy),* 190 B.R. 327, 333 (Bankr.N.D.Ill.1995) (*Field* requires standard to be in accordance with common law of fraud; thus applicable test under § 523(a)(2)(A) is subjective).

The application of § 523(a)(2)(A) to credit card debt is particularly difficult because of the nature of a typical credit card transaction which involves no face-to-face contact with a lender. The decision to extend credit to a debtor is made at the beginning of the debtor-creditor relationship when a prospective debtor is approved for a credit card. Later,

when the debtor uses the card, credit is extended after verification of the validity of the card and the holder's pre-existing approved status by a third party merchant or bank who then looks to the credit card company for payment. Against this transactional reality, courts have attempted to measure the debtor's representations and the creditor's reliance thereon, and have fashioned various approaches to support non-dischargeability judgments in credit card cases.[4] Clearly to give literal effect to the statute would be to except credit card transactions from the reach of § 523(a)(2)(A) since a debtor makes no actual representation to the creditor when using a card and a credit card issuer, not a direct party to the transaction whereby the credit is accessed, does not contemporaneously rely on any representation, even one implied.[5]

### B.

We do not think Congress intended to insulate a debtor who fraudulently uses a credit card.[6] Rather, we believe that the common law elements of fraudulent misrepresentation can be applied to a credit card transaction to determine dischargeability under § 523(a)(2)(A). Initially, we concur with courts that hold that the use of a credit card constitutes an actual representation that the debtor intends to repay the money being borrowed. *E.g., American Express Travel Related Services Company, Inc. v. Christensen (In re Christensen)*, 193 B.R. 863, 866 (N.D.Ill.1996) (use of card a representation that debtor will pay in future); *Briese*, 196 B.R. at 449–450 (use of card constitutes actual representation of future performance and if at time made is not intended to be honored is actionable as fraud); *AT & T Universal Card Services v. Richards (In re Richards)*, 196 B.R. 481, 482 (Bankr.E.D.Ark.1996) (by use of card debtor represented that she intended to pay charges); *Murphy*, 190 B.R. at 332 (person obtains goods or services with credit card by promising to pay in future which constitutes a representation of intent to perform act in future). That representation flows directly from the cardholder's express promise to use the card according to the terms and conditions contained in the cardholder agreement, including repayment of the credit extended. Each use of the card, accompanied by the cardholder's signed acknowledgement of additional indebtedness incurred pursuant to the card agreement, is a reaffirmation of that intent to repay. The use of the card does not represent a separate contract but rather is the anticipated perfor-

---

**4.** *See Chevy Chase Bank FSB v. Briese (In re Briese)*, 196 B.R. 440, 446–448 (Bankr.W.D.Wis. 1996) (discussing various overlapping theories and noting the emerging consensus that none of the approaches fully explains or resolves the debtor's fraudulent use of a credit card.)

**5.** Indeed recent cases suggest that § 523(a)(2)(A) may have no viability with respect to a credit card transaction. *AT & T Universal Card v. Alvi (In re Alvi)*, 191 B.R. 724, 731–32 (Bankr.N.D.Ill. 1996) (holding that the use of a credit card in a transaction constitutes no form of representation at all); *The GM Card v. Cox (In re Cox)*, 182 B.R. 626, 634–35 (Bankr.D.Mass.1995) (same).

**6.** Nor do we subscribe to the theory that a credit card issuer assumes the risk of non-payment until such time as the creditor withdraws the credit line because the debtor has exceeded the credit line or committed some other default. The minority of courts applying this theory believe that creditors factor the risk of nonpayment into their calculation of interest and fees so that they will be able to absorb an anticipated amount of loss and still earn a profit. Based on the creditors' own anticipation of losses, these courts hold that fraud does not occur until a debtor uses a card in defiance of the creditor's directive to

cease doing so on account of a default, being over the credit limit, or some other basis for ending credit privileges. *First National Bank of Mobile v. Roddenberry*, 701 F.2d 927, 932–933 (11th Cir.1983).

While we recognize that creditors necessarily factor bad debt losses into their fee structure, Charles G. Hallinan, *The "Fresh Start" Policy in Consumer Bankruptcy: A Historical Inventory and an Interpretive Theory*, 21 U.Richmond L.Rev. 49, 100–106 (1986), we do not see how that practice inexorably leads to a rule that nondischargeability is reached only after the point of unauthorized use. The fact that creditors anticipate loss does not mean that they should be saddled with losses resulting from fraud. *See Briese*, 196 B.R. at 449 (creditor does not assume risk that the debtor is dishonest). We will, accordingly, deny discharge any time fraud is proven to exist, irrespective of whether it occurs before or after the use of a credit card is revoked. Credit card lenders should simply be held to the same standards as any other creditors, which by our understanding means that they should be entitled to a ruling of nondischargeability if they establish every element of fraud by the requisite level of proof.

mance of the contract created when the card was issued.[7] In this respect, the situation is no different than a draw down on a line of credit. Rather than finding a new representation to be made each time credit is accessed, we find the representation of intent to repay to be a continuing one so long as the cardholder uses the card.

Moreover, like other courts, we are not troubled by the absence of an express statement by the cardholder when the card is used.[8] It is completely consistent with fraud doctrine to find a representation from conduct. Traditionally, fraud is based on any type of conduct calculated to convey a misleading impression. Prosser at 736. *See also Briese,* 196 B.R. at 450.

Finally, we are able to find that these continuing representations are transmitted to lenders even though the lender is not a party to the transaction by which the credit may be extended. Since the lender must at some point be notified that the transaction occurred, the lender will as a matter of course be in receipt of any representation that accompanied it. The lender's failure to acquire contemporaneous knowledge of the debtor's affirmation of an intent to repay is not fatal to this analysis.

Concluding that a representation of intent to repay is made when a debtor uses a credit card, we will then need to measure when that representation is knowingly false. The obvious difficulty with applying the subjective test is that a debtor will hardly acknowledge an intent not to repay. The debtor's intention, or lack thereof, must be ascertained by the totality of the circumstances. Although we may reference some or all of the twelve factors often referred to by other courts,[9] we do not consider these factors to be controlling or to otherwise constitute a litmus test against which a debtor's intent must be ascertained.

Nor do we view the mere fact of inability to pay without more to be sufficient to justify finding an intent to defraud. We therefore reject those cases that measure a debtor's intention to repay by her ability to pay.[10] To do so would make a credit card

---

7. In this respect, we agree with the Court in *Cox,* 182 B.R. at 636, which found that the use of a credit card did not create a separate contract. *Contra Anastas v. American Savings Bank (In re Anastas),* 94 F.3d 1280, 1285 (9th Cir.1996) (each individual credit card transaction forms unilateral contract between the cardholder and card issuer whereby the cardholder promises to repay and the card issuer promises to reimburse the merchant who has accepted the card in payment). However, our view of the continuing nature of the representation of intent to pay overcomes the *Cox* Court's conceptual problem that reliance on the implied representation made upon use of a card is irrational in the face of the existing express promise made when the contract was formed. *See* p. 368 *infra.*

8. Presumably in recognition of this legal issue, the form charge slip which is signed by the cardholder making a purchase often now contains a statement that the signatory agrees to pay the amount thereon according to the cardholder agreement.

9. These factors, advanced by the 9th Circuit bankruptcy appellate panel in the oft-cited case *In re Dougherty,* 84 B.R. 653, 657 (9th Cir. BAP 1988), are:
    1. The length of time between the charges made and the filing of bankruptcy;
    2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;
    3. The number of charges made;
    4. The amount of the charges;
    5. The financial condition of the debtor at the time the charges were made;
    6. Whether the charges were above the credit limit of the account;
    7. Whether the debtor made multiple charges on the same day;
    8. Whether or not the debtor was employed;
    9. The debtor's prospects for employment;
    10. The financial sophistication of the debtor;
    11. Whether there was a sudden change in the debtor's buying habits; and
    12. Whether the purchases were made for luxuries.

    We agree that factor-counting is an inappropriate exercise when applying a subjective standard. *See Murphy,* 190 B.R. at 334 ("determination of fraudulent intent requires a review of the circumstances of the case at hand but not a comparison with circumstances (a/k/a 'factors') of other cases"). Yet consideration of these circumstances undoubtedly sheds light on the debtor's state of mind when her promise to repay was made.

10. We disagree with those cases that find that credit card debtors represent an ability to pay. *See e.g., Mercantile Bank v. Hoyle (In re Hoyle),* 183 B.R. 635, 638 (Bankr.D.Kan.1995); *Bank One Columbus, N.A. v. McDonald (In re McDonald),* 177 B.R. 212, 216–217 (Bankr.E.D.Pa. 1994); *Chase Manhattan Bank v. Weiss (In re*

debtor a guarantor of his or her financial condition, and would be contrary to the reason consumers use credit cards, *i.e.,* because they lack the ability to pay in full. *Briese,* 196 B.R. at 448. Many, if not most, consumer bankruptcy debtors incur additional liabilities after the point at which repayment becomes hopeless. To use a debtor's poor financial condition against her or him is antithetical to the fresh start policy and confers an advantage on credit card issuers unintended by Congress. As recently stated by the court in *Anastas,* 94 F.3d at 1285–1286;

> [T]he focus should not be on whether the debtor was hopelessly insolvent at the time he made the credit card charges. A person on the verge of bankruptcy may have been brought to that point by a series of unwise financial choices, such as spending beyond his means, and if ability to repay were the focus of the fraud inquiry, too often would there be an unfounded judgment of non-dischargeability of credit card debt.

*See also General Electric Capitol Consumer Card Co. v. Janecek (In re Janecek),* 183 B.R. 571, 575 (Bankr.D.Neb.1995) (insolvency is simply a factor to be considered in determining intent to repay, and should not result in conclusive presumption that intent was lacking).

■■■ Ultimately, since all debtors choosing to litigate fraud complaints will likely claim an intent to repay, the debtor's credibility will probably be the single most important determinant of intent in the trial setting. The effect of employing a subjective standard is that dischargeability will not turn on the reasonableness of the debtor's expectations under the circumstances.[11] *See AT & T Universal Card Services Corp. v. Totina (In re Totina),* 198 B.R. 673, 679–80 (Bankr. E.D.La.1996) (discharging gambling debt

where debtor had intent to repay at time credit extended); *Alvi,* 191 B.R. at 733–34 (same); *Murphy,* 190 B.R. at 334 (same).

## C.

■■■ Reliance proves to be the most elusive, and therefore difficult, of the § 523(a)(2)(A) standards to apply in a credit card situation. The difficulty arises from the inherent nature of the transaction that involves a credit analysis being made, if at all, at the inception of the relationship and the representation regarding the intent to repay with respect to the debt sought to be excepted from discharge being made sometime later. This temporal gap recently lead one court to find lack of reliance. In *Cox,* 182 B.R. at 636–637, the court found that a party extending credit under a contract (*i.e.,* the card holder agreement) relies upon the express promise in the contract, not a later implied representation of intent to repay. Moreover, according to *Cox,* the credit investigation done prior to issuing the card, not the later implied misrepresentation, is what the creditor relies upon. Finally, the mechanics of the transaction which involve no communication from the debtor to the creditor but rather a computer authorization based on the debtor's prior conduct (*i.e.,* prior payment default, a stolen card, exceeded credit limit) negate reliance on the implied intent to repay. Accepting this view is to effectively insulate credit card debt from the non-dischargeability provisions of the Code unless the credit card companies are to radically change their business practices. We are not prepared to do so. Nor are we prepared to follow those courts that have not required any independent proof of reliance on the part of a credit card issuer, seemingly implying reliance much as they have done the debtor's representation of intent to repay. Rather reliance constitutes a separate

---

*Weiss),* 139 B.R. 928 (Bankr.D.S.D.1992); *Household Card Services/Visa v. Vermillion (In re Vermillion),* 136 B.R. 225, 226–27 (Bankr. W.D.Mo.1992). This view is reinforced by the terms of § 523(a)(2)(A) which expressly restrict courts from finding fraud on the basis of unwritten statements of a debtor's financial condition. *See, e.g., Anastas,* 94 F.3d at 1285; *Cox,* 182 B.R. at 630. *Compare* § 523(a)(2)(B).

**11.** We acknowledge that there may be circumstances where a debtor's professed intention to repay is so unrealistic as to cast doubt on her subjective intent. In such cases, objective evidence of futility may overlap with subjective intent. *Cf. Carolin Corp. v. Miller,* 886 F.2d 693, 701 (4th Cir.1989) (considering whether a bankruptcy filing was in bad faith).

and independent element that must be established by the plaintiff.[12]

Holding that proof of justifiable reliance is required and articulating what that reliance would be in a credit card situation are far different matters. In the instant case, as in many of the reported decisions, the creditor offers no evidence of reliance, merely introducing the card holder agreement pursuant to which the debtor has promised to repay charges incurred through use of the card in the manner provided under the agreement. Courts enforcing reliance as an element of proof have found against creditors taking this stance. *E.g., Christensen*, 193 B.R. at 867 (court rejects plaintiff's argument that mere use of card satisfies showing that it not only relied upon debtor's misrepresentation but that the reliance was reasonable and affirms bankruptcy court ruling of dischargeability in the absence of any evidence of reliance); *Richards*, 196 B.R. at 482 (while the Supreme Court indicated in *Field v. Mans* that justifiable reliance may vary with the facts and circumstances of the particular case, the element must be proven by some evidence); *FCC National Bank v. Willis (In re Willis)*, 190 B.R. 866, 869–870 (Bankr.W.D.Mo.1996) (where no evidence offered to show what facts were available to creditor when card used, creditor failed to meet burden on fourth element and debt dischargeable) *aff'd*, 200 B.R. 868 (W.D.Mo.1996); If no evidence of reliance is fatal, then what evidence will satisfy a creditor's burden to sustain non-dischargeability of a credit card debt?

To answer this question we turn first to the teachings of the Supreme Court in *Field v. Mans*. There the Court stated:

> The Restatement [(Second) of Torts (1976)] expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.' *Id.* § 540.

— U.S. at ——, 116 S.Ct. at 444. However, justifiability is not without limits, the Court further notes:

> A person is 'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'

*Id.* (quoting Restatement (Second) of Torts (1976) § 541, comment a). Or as stated by Prosser:

> Justifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and that '[i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation on his own.'

W. Prosser, Law of Torts § 108, p. 718 (4th ed. 1971). Finally we note the Court's admonition that "[j]ustification is a matter of the

---

**12.** We reject the view, expressed by the courts in *Citibank South Dakota, N.A. v. Dougherty (In re Dougherty)*, 84 B.R. 653, 656 (9th Cir. BAP 1988) *AT & T Universal Card Services v. Burdge (In re Burdge)*, 198 B.R. 773, 776 (9th Cir. BAP 1996) and *Colonial National Bank USA v. Leventhal (In re Leventhal)*, 194 B.R. 26, 28 (Bankr.S.D.N.Y. 1996), that we need not find reliance. In reaching that conclusion, the *Leventhal* court relies on *In re Shanahan*, 151 B.R. 44, 46 (Bankr. W.D.N.Y.1993), a pre-*Field v. Mans* decision, for the proposition that some fraudulent acts do not involve reliance upon a representation and " 'slavish adherence' to the five elements of fraud ... was not required at common law." *Field v. Mans*, however, construes actual fraud in the context of § 523(a)(2)(A) and states that the plaintiff must prove justifiable reliance. At most it reserves opinion on whether the standard for establishing reliance where the § 523(a)(2)(A) ac-

tion is based on false representations is the same (i.e. justifiable) or different. "Although we do not mean to suggest that the requisite level of reliance would differ if there should be a case of false pretenses or representation but not of fraud, there is no need to settle that here." — U.S. at —— n. 8, 116 S.Ct. at 444 n. 8. In *Dougherty*, the court notes the inherent difficulty in finding representation and reliance where dischargeability relates to use of a credit card and concludes that non-dischargeability of pre-revocation charges will follow where the creditor can establish actual fraud by showing charges were made without intent to pay. However, in light of the subsequent *Anastas* decision by the 9th Circuit which requires proof of justifiable reliance by the credit card issuer, *see* page 367 *supra*, the bankruptcy appellate panel's view appears to have been overruled.

qualities and characteristics of the particular plaintiff and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." —— U.S. at ——, 116 S.Ct. at 444.

These principles gleaned from *Field v. Mans,* a case not involving credit card debt, may be usefully applied in that context. The Supreme Court's guidelines allow us to recognize the unique character of credit card lending and identify what would be justifiable reliance in extending credit card debt. Having found a continuing representation of intent to repay, we have no difficulty concluding that the cardholder does rely on that representation as it authorizes the draws on its credit line.

▮▮▮▮ Reliance in a credit card context, as in any other context, is justifiable if the falsity of the representation is not apparent to "one of his knowledge and intelligence from a cursory glance." In rejecting those cases that impose a duty to investigate in the absence of anything that would arouse suspicion, the Supreme Court implicitly accepts as justifiable the extension of credit where the card use does not send up any red flags. Thus, following an initial credit check that uncovers no problems, if a cardholder's use is consistent with past use, and the cardholder is paying the minimum charge and staying within credit limits, reliance on the cardholder's implied representation of intent to repay will generally be justifiable.[13] *Anastas,* 94 F.3d at 1286 (justifiable reliance on representation of intent to repay as long as the account is not in default and any initial investigations into a credit report do not raise red flags that would make reliance unjustifiable).

▮▮▮ This test recognizes that some credit card companies choose not to perform any credit analysis but rather distribute their cards freely. Unsolicited credit cards are received in the average American household with the same frequency as discount shopping coupons. Presumably these lenders have calculated the increased risk that this practice entails and have factored it into the pricing of their product through finance and other charges. We agree with those courts that generally find no reliance in this situation so long as the lender takes no steps to restrict card use.[14] As stated by the bankruptcy court in *Alvi,* 191 B.R. at 731:

> Passively extending credit hardly constitutes reliance on individual instances of card usage, nor can this Court conceive why such reliance, if it did exist, should always be justifiable. A creditor cannot sit back and do nothing and still meet the standard for actual and justifiable reliance when it had an opportunity to make an adequate examination or investigation.

*Accord Christensen,* 193 B.R. at 867. *See also Manufacturer's Hanover Trust Co. v. Ward (In re Ward),* 857 F.2d 1082, 1084 (6th Cir.1988); *Manufacturer's Hanover Trust Co. v. Cirineo (In re Cirineo),* 110 B.R. 754, 761–762 (Bankr.E.D.Pa.1990).

▮▮▮ Moreover, when a credit card company does engage in a credit analysis but allows the use of its card contrary to the findings of that analysis, the creditor will be found not to have justifiably relied. In *Briese,* 196 B.R. at 453, the credit card company sent debtors a pre-approved solicitation because they fit within its desired customer profile. Their subsequent credit check revealed outstanding debt equal to 66% of their annual income but they were nonetheless granted a sizable credit allotment. The court found that the lender relied on its investigation in extending the credit and allowing continued use of the card, not the debtors' actions or representations. Moreover, it found that to the extent it did rely on

---

13. For example, justifiable reliance exists when a cardholder is using one credit card to pay off another, thereby creating the illusion that he intends to pay his credit card debt and honor his credit card agreement. That practice, known as kiting, induces the lender to extend credit in justifiable reliance on the debtor's satisfactory account history. *Citibank (South Dakota), N.A. v. Eashai (In re Eashai),* 87 F.3d 1082, 1091 (9th Cir.1996).

14. Contrary to cases applying the "assumption of the risk" theory, *see* note 6 *supra,* dischargeability would follow only because the creditor made no cursory investigation of the representation of the intent to repay as to which it could justifiably rely. Moreover, we do not rule out the possibility that there could be some credit card use that is so contrary to the expectations of even a lender who performs no credit analysis that a ruling of non-dischargeability might be made.

the debtors' representations, such reliance was unjustified in the face of the debtors' financial situation of which it was aware. Because the plaintiff ignored an obvious risk in extending credit to the debtors, the court would not allow it to claim justifiable reliance on the debtors' representations.

In short, we conclude that a creditor must establish actual reliance on the debtor's continuing representation of an intent to repay and that reliance will be justifiable if the creditor utilized its opportunity to make a cursory investigation prior to the extension of the open ended credit account which supports the credit line granted and no "red flags" subsequently are raised.

## II.

Against this background we will now turn to the facts of the present case. We find that AT & T has proven the first, second, third, and fifth elements of fraud. AT & T has, however, failed to prove the fourth element, that it relied on the debtor's misrepresentations, and for this reason AT & T's objection to discharge will be denied.

AT & T established the first two elements of fraud by demonstrating that Ms. Feld uttered several false representations. Each transaction in which Ms. Feld participated, be it a charge, cash advance or use of a convenience check, constituted a representation that she intended to repay the amounts borrowed. The representations in question, all occurring between May and July 1995, were false. Moreover, Ms. Feld knew the representations were false when she made them. The essence of this ruling is that we simply found Ms. Feld to be an unbelievable witness. On key issues Ms. Feld's testimony was either too uncertain or incomplete for us to believe her. Although she stated that she intended to make repayment, her testimony in this regard was equivocal. At the same time she stated that it was her intention to become employed full time and make repayment, she also acknowledged that chronic fatigue was preventing her from pursuing this goal. If Ms. Feld's testimony about chronic fatigue is true, she was stricken by this ailment in 1994 so that by the summer of 1995 when she ran up the charges at issue she was acutely aware of its impact on her life and the fact that she was not in a position to return to full-time employment. *Compare Household Credit Services, Inc. v. Turzo,* 1991 WL 242974 (Bankr.E.D.Pa.1991) (totally unexpected serious illness of business partner and wife came to light after use of credit card). Once in possession of this knowledge it was contradictory for her to state otherwise. Moreover, we note that Debtor was aware of the maximum amount she could earn without affecting her social security disability benefits which she had been receiving since 1990, and had never held a job earning more than $500 per month.

Ms. Feld's improbable and uncertain explanations for the use of the credit card advances also gives rise to skepticism concerning her veracity. For instance, since Ms. Feld wrote a check directly to her psychiatrist on July 10, we find it improbable that she also used funds from the $4,000 check she wrote out for herself on July 3 for that same purpose as she thought might have been the case. Moreover, her purported inability to specifically recall the use of the $4,000 is suspect. This sum of money was in excess of a third of Ms. Feld's entire annual income, yet she was unable to state with certainty the use to which the money was put. At Ms. Feld's income level, it must have been a very unusual event to write out a $4,000 convenience check for herself. We cannot accept that writing the check was a routine act, such that it would not have left a distinct impression on Ms. Feld's memory. To the contrary, Ms. Feld likely had a purpose for writing the check, and she likely used the money toward that purpose. When recalling the event a year later at trial, she should have been able to identify the primary use of the money without hesitation, and without having to punctuate her explanation by saying she did not know or remember. We have the same doubt about the $1,000 cash advance Ms. Feld took out on June 19 and do not find her ignorance with respect to the use of these funds to be credible either.

372

Judging from Debtor's list of creditors, credit card financing [15] was utilized to supplement her social security and counseling income. This appears to be born out by her practice of "rotating" use of her credit cards.

Finally we note that all of Debtor's activity occurred over a two month period from May 26 to July 26 during which she made only one $15.00 payment on account of her debt. While she testified that she only contacted an attorney in August after a consumer credit counseling agency at some unspecified prior date suggested bankruptcy as her best option, the proximity of this credit counseling to the incurring of the charges leaves open the possibility that the suggestion of the bankruptcy option may have preceded some or all of the debt she incurred. The evidence is inconclusive on this point. In any event, unlike the debtors in *Janecek* (repayment plan proposed) and *Cirineo* (home equity loan sought), Debtor made no effort to deal with her debt in any way other than filing for bankruptcy.

We are also satisfied that AT & T established the third and fifth elements of fraud. With respect to the third element, it is evident that Ms. Feld intended to induce AT & T to extend her credit by requesting cash advances, making charges and using convenience checks. The use of any of these mediums is the functional equivalent of a request for an extension of credit and thus displays the requisite intent to induce action. And as to the fifth element, it is quite evident that AT & T has been damaged by the Debtor's actions. The Debtor extracted some $8,000 of credit from AT & T which has not been repaid.

Nevertheless, AT & T's case must fail because it did not establish reliance. AT & T based its case upon the pattern of the charges, the proximity of the charges to the bankruptcy filing, and the Debtor's inability to effect repayment. AT & T submitted documentary evidence to back up these facts and then rested without presenting any evidence, documentary or otherwise, on reliance. On this record, there is no basis for us to conclude that credit was extended to Ms. Feld on the basis of any representation asso-

ciated with the use of plaintiff's credit card. To the extent AT & T did a credit check on Debtor, it would have learned that Ms. Feld had been receiving disability income since 1990 and earned $9000—$9500 for the prior two years, a sum seemingly incompatible with a credit line of $7700. On those facts without more, reliance would not have been justifiable. Of course, if Ms. Feld failed to accurately disclose her income and employment status, AT & T's reliance might have been justifiable. However, the record is silent on this issue. Thus, without any evidence that AT & T actually relied on the representations accompanying Ms. Feld's use of her credit card, we must find that AT & T has not met its burden on this issue. Having failed to establish each element of its cause of action under § 523(a)(2)(A), the debt will be discharged.

An Order consistent with this Opinion will be entered.

**15.** In addition to AT & T, Debtor scheduled the following debts:

GM Card—$6,400.
First Card—$2,000.