**In re James R. LIPPERT and Shannon A. Lippert, Debtors.**

**HUNTINGTON NATIONAL BANK, Plaintiff,**

v.

**James R. LIPPERT, Defendant.**

**Bankruptcy No. 96–12338.
Adversary No. 96–1206.**

United States Bankruptcy Court, N.D. Ohio.

March 4, 1997.

---

Stephen D. Hobt and Burl C. Robinette, Cleveland, OH, for Debtors–Defendant.

Karen E. Hamilton, Weltman, Weinberg & Reis, Cleveland, OH, for Plaintiff.

## MEMORANDUM OF OPINION

DAVID F. SNOW, Bankruptcy Judge.

Huntington National Bank filed this adversary proceeding to establish that James Lippert's credit card indebtedness to it is non-dischargeable under section 523(a)(2)(A) of the Bankruptcy Code. According to Huntington, Mr. Lippert incurred this indebtedness as part of a credit card kiting scheme pursuant to which he took cash advances on one of his Huntington credit cards under circumstances which indicated that he had neither the intent nor the ability to pay the debt. This is a core proceeding under 28 U.S.C. section 157(b)(2)(I) and was tried on November 13, 1996. This memorandum sets forth the Court's findings of fact and conclusions of law under Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### Facts

James and Shannon Lippert were married December 23, 1995. Mr. Lippert paid for the wedding with three checks drawn on that date on his Huntington credit card account. Mr. Lippert had 13 credit cards in all, including two from Huntington. One of the Huntington cards was issued to Mr. Lippert and his mother and the other, on which the checks for the wedding were drawn, was issued to Mr. Lippert and his ex-wife, Angela. When Huntington issued the second card to Mr. Lippert in 1989, it performed its usual credit check. Mr. Lippert was about 19 at that time and about 25 at the time of the trial.

James and Shannon Lippert had been living together for several years and decided to marry when Shannon became pregnant. Shannon Lippert, although a debtor in this case, was not liable on the Huntington card nor apparently on Mr. Lippert's other credit cards. These cards and much of Mr. Lippert's credit card debt predate their wedding and reflect indebtedness Mr. Lippert was obliged to pay under the terms of his divorce from Angela.

Mr. Lippert was fired from his job on March 15, 1995, for reasons that were not explained. This cut his income approximately in half from a take-home pay of about $600 a week to unemployment benefits of about $300 a week. Throughout 1995 he unsuccessfully sought work but did receive his bachelor's degree in business management from Baldwin–Wallace College in September 1995. He was reemployed as a stock clerk in January 1996 and took another fairly low paying job through a temporary agency at about the same time. He worked approximately 40 hours per week for each employer. His stock clerk position ended in May 1996 when he suffered an injury which prevented his continued employment. He continues to work a 40–hour week through the temporary agency. Although it is puzzling that someone with Mr. Lippert's education has been unable to find a better job, he is still young, and there is no evidence that he was, or believed himself to be, limited to low paying jobs in the future. Shannon Lippert is also employed and earned about $19,000 in 1995.

She continues in that employment after having taken a month's maternity leave after the birth of the Lipperts'. son in July. The Lipperts consulted their bankruptcy attorney in March 1996 after one of their secured creditors initiated a collection action. They filed their petition in this case on May 6, 1996.

At the time of filing Mr. Lippert's credit card indebtedness was about $43,000 of a total unsecured debt of about $48,000. During the period from January 1995 through December 1995 Mr. Lippert drew down a total of about $59,500 in cash advances and made total payments on his credit cards of about $57,400. Mr. Lippert's practice during this period was to pay off the balance on one credit card with the proceeds of cash advances from another card. For the period January 1995 through December 5, 1995, Mr. Lippert took down from Huntington cash advances of $12,500 and made payments of $10,300. The difference is reflected in the three cash advances totaling $2,400 which are the subject of this dischargeability proceeding.

Debtors' schedules filed in 1996 show that the couple's monthly expenses were about $1,000 more than their income. It also appears that there would have been a discrepancy between the Debtors' income and expenses during the nine months that Mr. Lippert was unemployed during 1995, but the evidence is unclear as to how much of the Debtors' credit card indebtedness was incurred during this period. The parties stipulated to various cash advances and payments on Mr. Lippert's credit cards during a substantial part of the 1995–96 period which appear to support Huntington's contention that the Debtors were financing their living expenses in part through credit card advances. During this period the Debtors also borrowed some money from Mr. Lippert's parents. Huntington did not allege that the Debtors lived luxuriously. So far as appears from the evidence the Debtors lived quite modestly with few indulgences other than the December 1995 wedding.

### Analysis

The Lipperts' credit card travails reflect a pervasive and serious consumer finance problem that is widely blamed for the recent dramatic increase in consumer bankruptcy filings. These filings have in turn spawned a rash of nondischargeability proceedings initiated by credit card issuers attempting to cut bad debt losses. The volume of these proceedings is due not only to aggressive collection efforts by credit card issuers but to the uncertainty of the law governing discharge of credit card debt. Although there is agreement that the dischargeability of credit card debt is governed by section 523(a)(2) of the Bankruptcy Code,[1] the cases reflect substantial disagreement as to how the ordinary fraud concepts—intentional misrepresenta-

---

1. Section 523(a)(2) of the Bankruptcy Code provides in relevant part that:

    A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
    . . . .
        (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
        (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
        (B) use of a statement in writing—
        (i) that is materially false;
        (ii) respecting the debtor's or an insider's financial condition;
        (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
        (iv) that the debtor caused to be made or published with intent to deceive; or

    (C) for purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $1,000 for "luxury goods or services" incurred by an individual debtor on or within 60 days before the order for relief under this title, or cash advances aggregating more than $1,000 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 60 days before the order for relief under this title, are presumed to be nondischargeable; "luxury goods or services" do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor; an extension of consumer credit under an open end credit plan is to be defined for purposes of this subparagraph as it is defined in the Consumer Credit Protection Act.

tion by the debtor and detrimental reliance of the creditor—can or should be applied to credit card debt. This problem is exacerbated by the fact that few circuits have provided much guidance on the issue.

The Sixth Circuit addressed the question of the dischargeability of credit card debt nearly 10 years ago. *Manufacturer's Hanover Trust v. Ward (In re Ward)*, 857 F.2d 1082 (6th Cir.1988). It held the debt dischargeable despite the fact that the debtor, who was insolvent and had been convicted of embezzlement, had misrepresented his financial condition to the issuer when he obtained his card. The issuer, however, had failed to make any check of the debtor's credit. The court held that "a credit check must be conducted at some point" and that in its absence the issuer assumed the risk of nonpayment. *Id.* at 1085. In this case, however, the issuer checked Mr. Lippert's credit when the card was issued, and Mr. Lippert offered no proof or argument that Huntington's credit check was inadequate. Although the Eleventh Circuit had held in a Bankruptcy Act case that the issuer bore the risk of all credit card misuse until the card was revoked, *First Nat'l Bank of Mobile v. Roddenberry*, 701 F.2d 927 (11th Cir.1983), its holding has won few adherents and it appears unlikely that the Sixth Circuit would apply an assumption of risk approach where, as here, Huntington did a credit check when the card was first issued and there was no evidence that Mr. Lippert had credit problems at that time. *See Household Credit Servs., Inc. v. Haji (In re Haji)*, 201 B.R. 176 (E.D.Mich.1996). Since there is no controlling Sixth Circuit precedent, the Court must look for guidance elsewhere.

Fortunately, or unfortunately, it does not have far to look. There have recently been a plethora of published opinions in which courts have endeavored to provide the definitive analysis of credit card fraud under section 523(a)(2)(A). This has proved a daunting task. To some courts it is clear that no representation should be implied from credit card use, *Citibank South Dakota v. Dougherty (In re Dougherty)*, 84 B.R. 653, 656 (9th Cir. BAP 1988); *AT & T Universal Card v. Alvi (In re Alvi)*, 191 B.R. 724, 731 (Bankr.

N.D.Ill.1996); *J.C. Penney Co. v. Shanahan (In re Shanahan)*, 151 B.R. 44, 47 (Bankr. W.D.N.Y.1993), while to others such implication is necessary and appropriate. *AT & T Universal Card v. Feld (In re Feld)*, 203 B.R. 360, 366–67 (Bankr.E.D.Pa.1996); *Chevy Chase Bank v. Briese (In re Briese)*, 196 B.R. 440, 449–50 (Bankr.W.D.Wis.1996); *Chase Manhattan Bank v. Murphy (In re Murphy)*, 190 B.R. 327, 332 (Bankr.N.D.Ill. 1995); *Citicorp Credit Servs., Inc. v. Hinman (In re Hinman)*, 120 B.R. 1018, 1021 (Bankr.D.N.D.1980).

Although the earlier cases often stated that the implied representation included both the intent and ability to pay the charges incurred, *Ward*, 857 F.2d at 1087 (Merritt, J., dissenting); *Hinman*, 120 B.R. at 1021; *FCC Nat'l Bank v. Branch (In re Branch)*, 158 B.R. 475, 477 (Bankr.W.D.Mo.1993), most of the recent cases have limited the implied representation to the intent to pay. *See, e.g., Anastas v. American Savings Bank (In re Anastas)*, 94 F.3d 1280, 1285 (9th Cir.1996); *Murphy*, 190 B.R. at 332.

Having found the requisite implied fraudulent intent, some courts have required little or no actual proof of reliance by the card issuer. *See, e.g., Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1091 (9th Cir.1996); *Hinman*, 120 B.R. at 1022. Other courts have insisted on specific proof of reliance by the issuer on the implied misrepresentation. *See, e.g., Feld*, 203 B.R. at 368–69; *Alvi*, 191 B.R. at 730. This division reflects a split between those courts which impose some obligation upon the issuer to protect itself against deadbeats and others which do not. *Compare Feld*, 203 B.R. at 372 *and Alvi*, 191 B.R. at 731, *with AT & T Universal Card Services v. Burdge (In re Burdge)*, 198 B.R. 773, 777 (9th Cir. BAP 1996).

Although most courts concur that credit card debt is nondischargeable if the debtor did not intend to pay the debt incurred, there is some uncertainty as to how that intent is to be proved. Following *Field v. Mans,* —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), courts appear virtually unanimous that the fraudulent intent not to pay required to make the debt nondischargeable under

section 523(a)(2) is the debtor's actual intent, which is to be ascertained from the relevant facts and circumstances. The Ninth Circuit identified a non-exclusive list of 12 factors as the presumptively relevant facts and circumstances to determine this "subjective" intent. *Eashai*, 87 F.3d at 1087–88. Some courts have rejected the use of such factors as unhelpful and probably inconsistent with the application of a subjective standard. *See Feld*, 203 B.R. at 367; *Murphy*, 190 B.R. at 333–34.

■ The upshot of these diverse and often conflicting analyses persuades the Court that, however inviting, one more attempt to distill the true nature of credit card fraud would not be a useful exercise, particularly since the purpose of this opinion is to provide creditors and debtors with guidance as to the approach this Court will follow in credit card fraud cases pending clarification by a superior court. Moreover, despite serious theoretical and analytical differences, the cases reflect an emerging consensus that credit card debt will be held nondischargeable only if it appears both that the debtor could not have realistically expected to pay the charges incurred and that she did not, in fact, intend to do so. In other words the proscribed fraudulent intent cannot be inferred solely from the debtor's insolvency, unemployment, or financial condition as so many issuers appear to assume. This emerging consensus is reflected in three recent decisions by the Ninth Circuit Court of Appeals. *American Express Travel Related Servs. Co., Inc. v. Hashemi (In re Hashemi)*, 104 F.3d 1122 (9th Cir.1996); *Anastas v. American Savings Bank (In re Anastas)*, 94 F.3d 1280 (9th Cir.1996); *Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082 (9th Cir.1996).

In *Eashai* the debtor had accumulated credit card debt of over $100,000 on 26 credit cards after he became unemployed from a job that had paid him only $24,000 a year. The debtor's practice was to keep his cards current by making the minimum monthly payments from credit card advances. By the time he filed for bankruptcy, he owed Citibank over $20,000, which had been used to finance the monthly minimum payments on

his credit cards as well as a trip to Pakistan and a $1,000 gambling spree. *Eashai*, 87 F.3d at 1085–86. The court characterized the debtor's use of his cards as a credit card kiting scheme from which it inferred that the debtor had no intention of repaying his debt to Citibank, *Id.* at 1091, and held that the debt was nondischargeable under section 523(a)(2). *Id.* at 1092.

In *Anastas* the debtor, by the time he filed for bankruptcy, had credit card debts aggregating $40,000 incurred primarily to finance his gambling. Although the debtor was insolvent and had no prospect of repaying his credit card obligations, except through gambling, the court held that the record did not show the "malicious and bad faith intent not to repay that is necessary for a finding of actual fraud under section 523(a)(2)(A)." *Anastas*, 94 F.3d at 1287. The court stressed that nondischargeability could not be premised on the debtor's inability to repay the debt since "if ability to repay were the focus of the fraud inquiry, too often would there be an unfounded judgment of nondischargeability of credit card debt." *Id.* at 1285–86. The court distinguished *Eashai*, which it described as a nontypical credit card fraud case based on a credit card kiting scheme, from the more typical "loading up" case where a debtor incurred charges which she "planned to shortly discharge ... in bankruptcy." *Id.* at 1285.

In the most recent of the three cases the debtor, who already owed more than $300,000 in credit card debt, financed a six-week trip to Europe for himself and his family with nearly 170 charges on his American Express card totaling more than $60,000 and filed for bankruptcy promptly after his return home. *Hashemi*, 104 F.3d at 1124. Many of the charges were for luxuries and the court held that it could be reasonably inferred that the debtor "tried to have a last hurrah at American Express's expense." *Id.* at 1126. The court affirmed the lower court's judgment that the debtor did not intent to pay his credit card charges to American Express and that they were, therefore, nondischargeable under section 523(a)(2). *Id.*

■ The facts in this case do not justify nondischargeability of Mr. Lippert's debt to

Huntington under the criteria set forth in the Ninth Circuit cases or other recent bankruptcy cases, although at the time Mr. Lippert wrote the checks on his Huntington account to pay for his wedding he was clearly insolvent and had been unemployed for some nine months. During that time he had not only made a diligent but unsuccessful effort to find a new job but had graduated from a reputable college with a degree in business management. He was only 25 years old and, so far as appears, could have hoped to find a better paying job to finance his debt. Neither his actions nor those of his wife suggested that the wedding payments were a final splurge prior to writing off his debt in bankruptcy. He took on two jobs in January 1996, working a total of 80 hours per week until injuries forced him to give up one job, and first explored bankruptcy in March after a secured creditor had initiated a foreclosure action.

Arguably the wedding expenses were luxuries; at least they were not strictly necessary. On the other hand they were not particularly extravagant and were consistent with attributing to Mr. Lippert an intent to pay them rather than to wash them out in bankruptcy. It appears from the evidence that the Lipperts maintained a modest lifestyle and Huntington presented no evidence that Mr. Lippert used cash advances to finance other luxuries. In short, Huntington failed to present evidence of any sort of "loading up" to justify an inference that Mr. Lippert did not intend to pay his wedding expense.

Huntington argues, however, that Mr. Lippert engaged in a credit card kiting scheme like that in *In re Eashai, supra,* deferring his inevitable default by using loans from one card to pay in full the balance on the others. However, the facts in this case are quite different from those in *Eashai* and do not show an intent not to pay his credit card debt. The debtor in *Eashai* had used advances from 26 credit cards to make the minimum payments required on the cards while he accrued credit card indebtedness of more than $100,000. *Eashai,* 87 F.3d at 1086. The court concluded that "[a] debtor who uses cash advances on one credit card to make minimum payments on another credit card and has no intention to pay for the money, property or services received, engages in credit card kiting." *Id.* at 1088. In this case, however, the Debtor did not make only the minimum monthly payments on his credit cards. He used advances from one card to pay in full the indebtedness on another card. Although that practice may have permitted the Debtor to postpone the day of reckoning, it does not appear designed to enable him to pyramid debts he did not intend to pay.

There is no doubt that the Debtors used their 13 credit cards to attempt to tide themselves over during a difficult time and in doing so dug themselves deeper into debt. Thirteen cards are a lot, clearly more than are prudent, but there is no evidence that the Debtors improperly obtained or misused any of their other credit cards. In short, the evidence does not show that Mr. Lippert believed that he would be unable to pay the wedding debts he financed with his Huntington card, let alone that he did not intend to do so. Therefore, the analogy to check kiting that the court discerned in *In re Eashai* is much weaker under the present facts.

Check kiting constitutes an improper and probably criminal scheme of writing checks on bank accounts that have insufficient funds to cover them. A credit card, however, embodies a continuing invitation by the issuer to the cardholder to make purchases or take advances from funds loaned to him by the issuer. There is nothing illegal or improper about the cardholder accepting that invitation to tide himself over a period of adversity such as the Debtor's unemployment in this case. A debtor's expectation that his troubles may be temporary and that his situation will improve enough to permit him to pay his debts may be overly optimistic or unrealistic, especially in the hindsight of bankruptcy, but such behavior without evidence of "loading up" or other behavior evidencing an intent not to pay the debt incurred should not constitute fraud under section 523(a)(2)(A). Therefore there is no justification in this case for impairing the Lipperts' fresh start by

declaring the debt to Huntington nondischargeable.