**In re Kevin L. MURPHY, Debtor.**

**CHASE MANHATTAN BANK, Plaintiff,**

**v.**

**Kevin L. MURPHY, Defendant.**

**AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., Plaintiff,**

**v.**

**Kevin L. MURPHY, Defendant.**

**Bankruptcy No. 95 B 03977.**
**Adv. Nos. 95 A 00522, 95 A 00523.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Dec. 21, 1995.

328

Steven B. Levit, Levit and Lipshutz, Chicago, Illinois, for debtor/defendant.

Bruce E. de'Medici, Chicago, IL, for American Express.

### *MEMORANDUM OPINION*

RONALD BARLIANT, Bankruptcy Judge. .

The Debtor is a gambler. He likes the river boat casinos and he bets on his golfing skill. He is also an investor, particularly in stock options and common stocks. To the dismay of the plaintiffs, he financed these activities with their credit cards. Of course, they did not complain when he was winning and paying their bills. But after he lost for a while and filed bankruptcy, they charged him with fraud and now seek to have his debts to them declared nondischargeable. They maintain that the "implied representations" he made when he used his credit cards must have been fraudulent because of the speculative nature of his income. After all, a reasonable person would not have relied on the prospect of winning bets as the basis for a promise to pay credit card debts. The

Court, however, must apply the common law principles of fraud and determine, from all the circumstances, whether the Debtor actually intended to stiff the plaintiffs when he incurred the debts, regardless of the reasonableness of his professed contrary intent. The evidence does not support such a finding. The debts are therefore dischargeable.

## THE FACTS

The Debtor filed a petition under Chapter 7 of the Bankruptcy Code on February 27, 1995. He listed $213,103.76 in unsecured non-priority debt, all of which was credit card debt. According to Schedules I and J, the Debtor has a monthly income of $1,500 and monthly expenses of $1,460. The Statement of Financial Affairs also indicated that the Debtor had gambling losses of $180,000 in 1994.

The Debtor is self employed in the sale and management of residential real estate. Most of his income has been from managing real estate owned by one client. In 1993 the Debtor reported income from the real estate business of approximately $28,626 and in 1994 income of approximately $33,000. The Debtor also did a significant amount of gambling and investing in the stock market. His investments included some individual stocks, but consisted mainly of stock options—an inherently speculative form of investment that the Debtor himself described as betting.

For several years the Debtor maintained an account with a stock broker. In 1990 he did a significant amount of option buying, and then again in 1993 and 1994. The Debtor financed his investments by taking large cash advances on his credit cards. For a time the Debtor was successful enough to be able to repay the credit card advances, which he did. It was not until July of 1994 that the Debtor began a string of bad luck that sent him spiraling into an abyss of more and more gambling and investment losses and further debt. Following is a summary of the charge accounts that are the subject of these proceedings and some of the more significant transactions.

*Action by Chase Manhattan Bank*

The Debtor had two charge accounts with Chase Manhattan Bank ("Chase"): Account # 4226551366823 ("Account 1") was opened in August 1989; Account # 5465988754075706 ("Account 2") was opened in December 1991. Between November 25, 1994 and December 25, 1994, the Debtor made four charges totaling $4,332.68 on Account 1, two of those charges totaling $2,625.52 were for cash advances. Prior to incurring those charges, the balance on Account 1 was $5,334.10. Between October 30, 1994 and November 28, 1994, the Debtor obtained three cash advances on Account 2, totaling $4,554.73. Prior to those advances the balance on Account 2 was $2,718.11. Chase has requested a judgment of non-dischargeability in the amount of $17,590.77 plus interest, attorneys' fees and costs.

Account 1

| Trans. Date | Charge Amount | Payment Date | Amount |
|---|---|---|---|
| 9/16/92 | $6,339.03 | 10/16/92 | $2,000 |
|  |  | 11/16/92 | $2,000 |
|  |  | 12/16/92 | $2,537.97 |
| 11/16/93 | $9,000 | 12/9/93 | $9,100 |
| 7/16/94 | $2,087.98 [1] |  |  |
| 10/17/94 | $1,043.99 |  |  |
| 12/16/94 | $3,251 |  |  |
| 1/16/95 | $1,081.76 |  |  |

---

1. After this transaction the Debtor made only minimal monthly payments through year end averaging $76.00 per month and the last payment made was for $100.00 on 2/16/95.

Account 2

| Trans. Date | Charge Amount | Payment Date | Amount |
|---|---|---|---|
| 10/30/94 | $1,625.75 | | |
| 11/24/94 | $2,084.99 (gambling) | | |
| 11/28/94 | $ 843.99 (gambling) | | |

*Action by American Express Travel Related Services Co., Inc.*

The Debtor also had two accounts with American Express Travel Related Services Co., Inc. ("American Express"): Account # 3737–444432–22007 ("Account A") was opened in February 1982; Account # 3728–354344–25004 ("Account B") was opened in May 1982. The Debtor charged a total of $15,286.54 on Account A between July 1, 1994 and November 1994 and $6,951.34 on Account B between July 12, 1994 and December 21, 1994. Both accounts with American Express require payment of attorneys' fees. American Express requests a judgment of non-dischargeability in the amount of $22,166.96 plus interest, attorneys' fees and costs.

Account A

| Trans. Date | Charge Amount | Payment Date | Amount |
|---|---|---|---|
| 11/8/93 | $ 4,920.95 [2] | 12/9/93 | $4,997 |
| 1/24/94 | $ 9,000 | 2/28/94 | $9,023.62 |
| 7/10/94 | $12,000 [3] | | |
| 11/8/94 | $ 2,020 | | |
| 12/8/94 | $ 1,266.54 | | |

Account B

| Trans. Date | Charge Amount | Payment Date | Amount |
|---|---|---|---|
| 11/94–12/94 | $6,601.77 | | |

The charges on Account B were made during a trip the Debtor took to Thailand, a country the Debtor had visited every Christmas for 20 years. Most of the charges during his 1994 trip were for gambling and golf. The golf was not the recreational game, but again involved betting. Unfortunately for the Debtor's creditors, this gambling endeavor also failed to pay off.

As the foregoing illustrates, the Debtor regularly took large cash advances, and, for a time, repaid them. It was not until July 1994 that the Debtor began a losing streak that rendered him unable to repay the advances, although he did make relatively small periodic payments until bankruptcy. The evidence established that the Debtor could not have paid the credit card debt solely from the income earned at his day job in the real estate business. The evidence also showed that the Debtor knew he could not pay his credit card debts from that income alone. He needed to win at gambling or his investments to stay solvent, and he knew it.

After returning from his Christmas trip to Thailand, the Debtor learned that his income from real estate management services would be reduced to $1,500 per month. The Debtor testified that he realized he was in over his head and in February of 1995, for the first time, consulted with an attorney about the possibility of filing a bankruptcy petition. The petition in this case was filed late that month.

2. This transaction represents the transfer of the balance due on a line of credit to Account A.

3. After this transaction the Debtor made monthly payments through year end averaging $337.

## DISCUSSION

### 1. Of Credit Cards and Bankruptcy Discharge: Competing Theories Regarding the Representation Issue

Section 523(a)(2)(A) provides that a debtor is not discharged from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

Bankruptcy Courts have struggled with the application of the traditional elements of fraud (false representation, intent to deceive, reliance and damages) to credit card debts. The problem is that the Debtor presents the card, not to the issuer of the card that is extending the credit, but to the entity that is selling the goods or services. "[T]he cardholder and bank have no personal contact. Consequently, the cardholder cannot be said to have directly represented anything to the issuing bank [and] the bank has nothing upon which to base an act of reliance." *Matter of Ford,* 186 B.R. 312, 317 (Bankr.N.D.Ga.1995) (citation omitted). As another court explained the problem:

> Third party credit card transactions, however, are not typical fraud cases due to the difficulty, if not impossibility, of applying the concepts of representation and reliance to situations where the card holder, in making use of the card presents it not to the bank issuer seeking section 523 relief but to a retail merchant who accepts it in faith that the issuing bank will pay him. Credit card cases involve an ongoing relationship between the holder and issuer with only infrequent inquiry being make concerning the status of the holder's financial affairs. Recognizing this relationship, courts have come to modify the way in which the elements of section 523(a)(2)(A) proof are met in credit card situations.

*In re Hinman,* 120 B.R. 1018, 1021 (Bankr.D.N.D.1990). *Hinman* and other courts resolved this problem by adopting an implied representation theory: "The use of a bank or credit card is an implied representation to the issuer that the holder has both the intent and ability to pay the issuer for the charged purchases and advances." *Id.* This "implied representation" satisfies the false representation element of a fraud claim.[4] Plaintiffs urge this Court to adopt the "implied representation" test.

The court in *First Nat. Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir.1983) also saw the problem as finding a fraud when the debtor was dealing with one party but incurring debt to another absent party. That court saw the alleged fraud as intentional concealment of insolvency. But, because the merchant "had no incentive to perform a credit check.... [t]he concept of intentional concealment ... loses its force...." *Id.,* at 931. In other words, since the merchant could not care less about the debtor's solvency, the theory of intentional concealment does not fit.

The court then decided that the card issuer assumes the risk that an insolvent holder would use the card and must bear the loss until the issuer "unequivocally and unconditionally revoked the right of the cardholder to further *possession and use* of the card, and until the cardholder is aware of this revocation." *Roddenberry,* 701 F.2d at 932–33 (emphasis in original). The Debtor argues that the "assumption of risk" theory more accurately reflects reality than the implied representation theory and is a better way to determine whether a debtor committed fraud when making credit card purchases or obtaining cash advances.

### 2. Another Approach: Applying the Common Law of Fraud

After reviewing the cases discussing and applying both tests, this Court concludes that neither theory correctly applies the requirements of § 523(a)(2)(A). When Congress adopted § 523(a)(2)(A) in the 1978 Bankruptcy Code, it chose to leave the concepts of "false pretenses" "false representation" and

4. The implied representation theory has been criticized in two recent opinions that collect and discuss many of the cases supporting that theory. *In re Cox,* 182 B.R. 626 (Bankr.D.Mass.1995); *In re Ford,* 186 B.R. 312 (Bankr.N.D.Ga.1995).

Many courts also created an implied reliance theory. See *e.g. Hinman,* 120 B.R. at 1022. That issue is discussed in *Cox,* at 636–37. Because of the view we take of this case, it is not necessary for us to deal with the reliance issue.

"actual fraud" undefined. "Where Congress uses terms that have accumulated settled meaning under ... the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Field v. Mans,* —— U.S. ——, ——, 116 S.Ct. 437, 443, 133 L.Ed.2d 351 (1995).

■ Any credit transaction involves a promise to pay. A credit card transaction is no different merely because the party extending the credit is not present to receive the promise. The presentment of a credit card, the signing of a charge slip or other express acknowledgment of the obligation and the receipt of value in exchange are enough to constitute such a promise.[5]

■ The Court does not agree with the implied representation cases that hold that the use of a credit card is also an implied representation of an ability to pay. One of the principal reasons people rely on credit is a present lack of ability to pay. *Ford,* 186 B.R. at 317 ("inferring a guarantee of ability runs afoul of consumer practice and the natural course of events in the marketplace.") But the use of a credit card is a representation regarding future action.[6] Under the common law a promise to perform a statement of future intention is actionable as

fraud only if, at the time the statement was made, the debtor never intended to honor his statement. *Crafton Building Corp. v. St. James Construction Corp.,* —— A.D.2d ——, 633 N.Y.S.2d 795 (1995); *General Motors Acceptance Corp., Inc. v. Covington,* 586 So.2d 178 (Ala.1991);' *Stacks v. Saunders,* 812 S.W.2d 587 (Tenn.Ct.App.1990). *See also* Restatement (Second) of Torts (1976) § 530(1) "A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention."[7]

### 3. The Intent Issue: Subjective or Objective

■ The more difficult issue is whether the representation of intention was made with an intent to deceive. Resolution of that issue requires identification of the applicable standard. There are at least two possibilities: an "objective" standard, requiring an inquiry into the reasonableness of the representation; or a "subjective" standard, requiring an inquiry into the debtor's state of mind at the time of the representation. Courts have commonly confused these standards. In the following passage from a typical credit card fraud opinion, for example, the first sentence is a strong statement of the subjective standard, but the court then immediately

5. Indeed, the charge slip may well contain an express promise. No charge slips were offered into evidence in this case.

6. In *In re Cox,* 182 B.R. 626 (Bankr.D.Mass. 1995) the bankruptcy court determined that an intent to pay credit card debts was not implied by the use of the card for purposes of determining dischargeability under § 523(a)(2)(A). We disagree. A person obtains goods or services in the present with a charge card by promising to pay for such goods or services in the future. That constitutes a representation of intent to perform an act in the future. That is a representation that may be actionable provided the other elements of fraud are proven (intent, reliance and damages). Now that the Supreme Court has instructed us to apply common law principles to dischargeability issues, such a representation may fall within the scope of § 523(a)(2)(A).

The *Cox* court, however, was concerned that intent not to pay is frequently equated with the debtor's ability to pay. The court saw this as an examination of the debtor's financial condition, even though § 523(a)(2)(A) expressly excludes a representation as to financial condition from its reach. Again, we disagree with the reasoning.

Intent to pay is not synonymous with ability to pay; at most, the latter is merely one factor to be considered in determining whether the debtor intended to repay. Alone, financial inability to repay does not establish fraudulent intent. *In re Ford,* 186 B.R. 312 (Bankr.N.D.Ga.1995) (fraud implied in law does not satisfy "actual fraud" standard of § 523(a)(2)(A)); *In re Dougherty,* 143 B.R. 23, 26 (Bankr.E.D.N.Y.1992) ("all courts agree that credit card usage by a debtor whose obligations exceed income does not, per se, sustain non-dischargeability.") And, as stated in the text, we do not view the use of a credit card as a "statement respecting the debtor's financial condition [*e.g.* ability to pay]." Section 523(a)(2)(A), therefore, does not bar reliance on the use of a card as a basis for determining nondischargeability.

7. In the Supreme Court's most recent discussion of § 523(a)(2) it determined the standard of reliance required by sub-section (A). *See Field, supra.* In determining the appropriate reliance standard it noted that in 1978, when § 523(a)(2)(A) was amended, "the most widely accepted distillation of the common law of torts was the Restatement (Second) of Torts (1976)." *Field,* —— U.S. at ——, 116 S.Ct. at 443–44.

slides into the objective standard, which is the one the court ends up applying:

> The burden on the creditor attempting to show fraud under § 523(a)(2)(A) is to prove that the debtor knew full well that any professed or implied intention to repay was false or was known by the debtor not to be well-grounded, and that he or she nonetheless deliberately used the card to obtain goods or money that he or she knew were beyond his or her ability to pay. (Citation omitted). If the creditor can make such a showing, then a professed intention to repay on the part of the use, or even highly positive hopes and plans to repay, does not purge an otherwise sophisticated cardholder's actions of fraud. The fact that one has profoundly fooled oneself with regard to prospects for the future should not mean that any consequent damage to others was merely inadvertent and not fraudulent. (Citation omitted).
>
> Thus, the issue here is whether, under a totality of the circumstances analysis, this debtor had a reasonable belief in his intent and ability to repay the debt.
>
> Given the evidence presented here, it is quite obvious that Debtor did not have a reasonable expectation of his ability to repay the credit card debts owed to the Plaintiff in this case.

*In re Berz,* 173 B.R. 159, 163 (Bankr. N.D.Ill.1994). In this case, the distinction is critical, as we shall see. A reasonably prudent person would not rely almost entirely on gambling and speculative investments as a basis for a promise to satisfy short term credit obligations. A reasonable person in the Debtor's circumstances would not have believed that he could continue to pay substantial credit card debts forever. Such a person would have realized that sooner or later he would lose enough to render him unable to pay those debts. But it is less clear that the Debtor had an actual intent to deceive.

■ So the outcome-determinative question is whether this Court should apply the objective or the subjective standard. Again, *Field* requires us to answer that question in accordance with the common law of fraud. The Restatement (Second) on Torts § 526 suggests that it is inappropriate to apply a "reasonable person" test to determine fraudulent intent. Comment d to § 526 states:

> The fact that the misrepresentation is one that a man of ordinary care and intelligence in the maker's situation would have recognized as false is not enough to impose liability upon the maker for a fraudulent misrepresentation under the rule stated in this Section, but it is evidence from which his lack of honest belief may be inferred. So, too, it is a matter to be taken into account in determining the credibility of the defendant if he testifies that he believed his representation to be true.

The Seventh Circuit, in a bankruptcy dischargeability proceeding, held that a debtor commits false pretense under § 523(a)(2)(A) when he makes a statement he "either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation." *In the Matter of Sheridan,* 57 F.3d 627, 635 (7th Cir.1995). This Court concludes that under the common law a subjective test of intent to defraud is required, and that is the test applicable under § 523(a)(2)(A).

### 4. Finding Subjective Intent

■ Finding whether the Debtor had that intent requires a consideration of all the circumstances. The subsequent failure to perform is alone clearly insufficient to prove there was no intent to perform when the statement was made. *Stacks.* Courts often recite lists of factors they supposedly look for when searching for intent to deceive.[8] Bankruptcy courts are especially good at reciting

---

8. In nonbankruptcy cases, these include:
   1. Whether subsequent events rendered execution of the promise unnecessarily difficult or impossible. *Croston v. Emax Oil Co.,* —— W.Va. ——, 464 S.E.2d 728 (1995).
   2. Whether the promisor knew of facts contradicting the promise at the time it was made. *AT & T Info. Systems, Inc. v. Cobb Pontiac–Cadillac, Inc.,* 553 So.2d 529 (Ala.1989) (salesman for AT & T promised a discount to buyer

when he knew the discount was not available to buyer).
   3. Whether the debtor clearly did not have the ability to re-pay the debt. *See* Restatement (Second) Torts § 530 com. (d) "The intention may be shown by any other evidence that sufficiently indicates its existence, as for example, the certainty that he would not be in funds to carry out his promise."

lists of factors. See *e.g., In re Berz,* 173 B.R. 159, 163 (N.D.Ill.1994) (lists eleven factors). The courts then compare the evidence to the list and count matches. ("Here, the first, third fourth, fifth, sixth, seventh, eighth, ninth, and eleventh factors described above apply to weigh against Defendant." *Id.*)

This factor-counting exercise turns the job of fact-finding on its head. What courts need to do is determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent. This determination will require a review of the circumstances of the case at hand, but not a comparison with circumstances (a/k/a "factors") of other cases. Obviously, it is instructive to know how other courts weighed and interpreted circumstances that are similar to those of the present case; that knowledge may even influence how the case under consideration is decided. But the fact-finding process is only clouded by copying a list of factors from other cases and weighing evidence according to how well it matches that list.

In this case, considering all the circumstances, the Court finds that at the time the Debtor incurred the debts at issue he intended to repay them and believed (however unreasonably) that he would have the means to do so from his gambling and investments. The Debtor had for years successfully relied on such "income" to pay off his credit card debt. As late as May, 1994, the Debtor was able to pay his credit card debts *in full after making a profit in the stock market.* The Debtor did not significantly alter his spending habits in the months preceding the filing of the bankruptcy petition; rather his betting did not come through for him as it had in the past. His trip to Thailand was not a spree, but the latest in a twenty-year series of annual visits to that country. There is no evidence that he considered bankruptcy during the time he was running up most of the charges. In fact his uncontradicted testimony is that he first consulted an attorney about bankruptcy shortly before filing. Based on these circumstances, the Court finds that the plaintiffs have failed to prove by a preponderance of the evidence that the Debtor actually intended to deceive them when he used their credit cards. Rather, the evidence shows that he honestly believed that he would be able to pay his debts.[9]

## CONCLUSION

In summary, this Court concludes that the use of a credit card is a representation concerning the user's intent to perform an act in the future. That representation is fraudulent only when made without the present intention to perform. In other words, the debtor must not have intended to pay the charges when he or she made them. The debtor's intent is to be determined by all of the facts and circumstances. In the final analysis, a subjective test of intent to deceive must be applied.

Since this Court has determined that the Debtor did not intend to deceive the Plaintiffs, it is not necessary to determine whether the remaining elements of a fraud claim under § 523(a)(2)(A) are present. The Plaintiffs request for judgments of nondischargeability are denied. Separate orders will be entered in accordance with this opinion.

---

9. Most of the cases involving non-dischargeability of debts incurred to fund gambling have reached the opposite result and concluded that speculative sources of income are an insufficient basis to form an intent to repay. *See In re Clagg,* 150 B.R. 697 (Bankr.C.D.Ill.1993) and citations therein at 698; *In re Karelin,* 109 B.R. 943 (9th Cir. BAP 1990). *But see Dougherty,* 143 B.R. 23 (Bankr.E.D.N.Y.1992). Those courts have incorrectly equated intent to deceive with inability to repay and have not properly considered the debtor's subjective intent to repay.