RHESA HAWKINS BARKSDALE, Circuit Judge,
dissenting:
I am not able to agree with the approach by either of my colleagues for resolving the issue presented by this appeal. Although the amount at stake is relatively *222 small, the issue is exceptionally important. The analysis for determining whether credit card debt is dischargeable in bankruptcy has enormous implications, not only for credit card issuers, but also for millions of credit card users. Moreover, neither the card’s being pre-approved, nor its use in large part for gambling, should alter the standards for representations and justifiable rebanee vel non.
According to a recent newspaper article, “bank, retail and credit-card industry advocates estimate consumer bankruptcies cost their businesses about $40 billion a year”. Dawn Kopecki & Jeffrey Taylor, House, Senate Diverge on Bills for Bankruptcy, Wall St. J., 4 Feb. 2000, at A20. As expected, that cost is passed along to users of those services. Bankruptcies are said to cost each United States household $400 annually, in part because, in order to recoup their losses from bankrupt cardholders, credit card companies increase interest rates for all of their customers. Julie Hyman, Senate Set to Pass Legislation to Curb Bankruptcy Abuse, Wash. Times, 2 Feb. 2000, at B8.
Our panel’s divergent views as to the proper analysis for dischargeability of credit card debt mirror the inconsistencies reflected in the opinions of other courts that have addressed this issue.[1] Among those courts are some of the bankruptcy and district courts in our circuit.[2]
Although Congress is considering bankruptcy reform legislation, it does not ad *223 dress the standard for determining credit card debt dischargeability. See H.R. 833, 106th Cong., 1st Sess. (1999); S. 625,106th Cong., 2d Sess. (2000). Accordingly, rehearing en banc is necessary and appropriate for this exceptionally important issue.
A.
Section 523(a)(2)(A) excepts from discharge “any debt ... for money ... to the extent obtained by ... false pretenses, a false representation, or actual fraud”. 11 U.S.C. § 523(a)(2)(A). Our court has applied different, but somewhat overlapping, elements of proof for actual fraud, as opposed to false pretenses/representation. See RecoverEdge L.P. v. Pentecost, 44 F.3d 1284, 1292-93 (5th Cir.1995).[3]
The false pretenses/representation prongs require the creditor to prove the *224 debtor made “(1) a knowing and fraudulent falsehood, (2) describing past or current facts, (3) that was relied upon by the other party”. Id. at 1293 (brackets, internal quotation marks, and citation omitted).
The actual fraud prong requires showing: (1) the debtor made representations; (2) she knew they were false when made; (3) she made them with the intent to deceive the creditor; (4) the creditor actually and justifiably relied on the representations; and (5) the creditor sustained a loss as a proximate result of the representations. Id.
Judge Duhé applies the former; Judge Dennis, the latter. Moreover, AT&T did not specify on which prong it based its complaint. Under either type, AT&T had the burden of proving the elements by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).
In the light of Field v. Mans, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), it is questionable whether there is justification for our applying different elements for § 523(a)(2)(A)’s false pretenses/representation and actual fraud prongs. Field, in defining the justifiable reliance element for actual fraud, relied on the Restatement (Second) of Torts (1976), which did not differentiate between false pretenses, misrepresentations, and actual fraud. See Field, 516 U.S. at 70-72, 116 S.Ct. 437. In any event, the elements for both types of actions being similar, dischargeability will be analyzed using those for § 523(a)(2)(A) actual fraud.
B.
Judge Duhé disposes of the case on the first element, concluding that Mercer made no representations each time she used the pre-approved credit card; and, that, because she made no representations upon obtaining the card as the result of a pre-approved solicitation, there were no representations upon which AT&T could actually or justifiably rely.
Obviously, this theory makes it virtually impossible for any issuer of a pre-approved credit card to prevail in a § 523(a)(2)(A) action. And, because the theory does not consider the debtor’s intent in incurring credit card debt, it is likely to result in the discharge of fraudulently-incurred debts, contrary to the language and purpose of § 523(a)(2)(A). See Grogan, 498 U.S. at 286-87, 111 S.Ct. 654 (“fresh start” policy of Bankruptcy Code is for benefit of “honest but unfortunate” debtors, not perpetrators of fraud); Chevy Chase Bank, FSB v. Briese (In re Briese), 196 B.R. 440, 449 (Bankr.W.D.Wis.1996) (“While the bankruptcy code is to be construed liberally in favor of the debtor, it is also to be fair to creditors.”).
Moreover, this theory could also have the unintended consequence of encouraging irresponsible and dishonest debtors to go on unrestrained spending sprees, until they have exhausted the credit limits of their accounts, secure in the knowledge their debts will be forgiven in bankruptcy court, as long as they wait at least 60 days before filing the petition. See 11 U.S.C. § 523(a)(2)(C) (consumer debt for luxury goods or services, or cash advances aggregating more than $1075, within 60 days before filing petition presumptively nondis-chargeable). Concomitantly, adoption of this theory undoubtedly would result in increased credit costs for millions of honest card users.
Finally, because Mercer did not rely on this theory or urge its application, adoption of this theory is especially troubling. In closing argument at the trial of the adversary proceeding in bankruptcy court, Mercer’s counsel stated he was not urging adoption of the “assumption of risk” theory *225 because “in all fairness it goes a little bit too far”. And, in her appellate brief, Mercer implicitly concedes that, each time she used the card, she made a representation of intent to pay the debt incurred.
Judge Duhé rejects the so-called “implied representation” theory urged by AT&T. Under it, with each use of a credit card, the debtor represents she intends to repay the amount charged. He does so on the grounds that, in deciding to extend credit to Mercer before she made any representations, AT&T assumed the risk of non-payment of charges incurred by Mercer through her subsequent card-use; and the theory would improperly shift the burden of proof in § 523(a)(2)(A) cases, by making the debtor a guarantor of her financial condition.
The first ground for rejection of AT&T’s “implied representation” theory is a variant of the much-criticized “assumption of the risk” theory adopted by the Eleventh Circuit in First Nat’l Bank of Mobile v. Roddenberry, 701 F.2d 927, 932-33 (11th Cir.1983).[4] The Bankruptcy Code should not be interpreted to require a creditor who investigates a debtor’s credit history prior to making a pre-approved solicitation, as AT&T did in this case, to assume the risk of the debtor committing fraud in subsequently using the card. “Rather, the credit card transaction (like any other lending relationship) is premised upon the notion that both parties will act in good faith. Thus, the debtor is expected to make ‘bona fide’ use of the card and not engage in fraud.” In re Briese, 196 B.R. at 449 (emphasis added).
Furthermore, the assumption of the risk theory ignores the nature of credit card transactions. More appropriate is the position of those courts which have viewed “each individual credit card transaction as the formation of a unilateral contract between the card holder and card issuer consisting of the following promise in exchange for performance; the card holder promises to repay the debt plus to periodically make partial payments along with accrued interest and the card issuer performs by reimbursing the merchant who has accepted the credit card in payment”. Anastas v. American Sav. Bank (In re Anastas), 94 F.3d 1280, 1285 (9th Cir.1996); see also AT&T Universal Card Servs. Corp. v. Searle, 223 B.R. 384, 389 (D.Mass.1998) (adopting Anastas unilateral contract approach because it “is consistent with the notion that a representation can be made by words or conduct and recognizes representation as inherent in the transaction”) (citing Restatement (Second) of Torts, § 525, comment b (1976)).
Moreover, the assumption of the risk theory is inconsistent with the common law, as expressed in the Restatement (Seoond) of Torts. See Restatement (Second) of Torts, § 530(Z) (“representation of the maker’s own intention to do or not to do a particular thing is fraudulent if he does not have that intention” (emphasis added)); id., comment c (“intention to perform the agreement may be expressed but it is normally merely to be implied from the making of the agreement”). Accordingly, when Mercer used her AT&T card to make a purchase or obtain a cash ad- *226 vanee, she represented her intent to perform her obligation under the cardmember agreement, i.e., to repay the debt by making at least the minimum monthly payment.
The second ground relied on by Judge Duhé for rejecting AT&T’s “implied representation” theory seems to be based on an assumption that the theory encompasses not only a representation of intent to repay, but also a representation of ability to do so. See Sears, Roebuck & Co. v. Hernandez (In re Hernandez), 208 B.R. 872, 877 (Bankr.W.D.Tex.1997) (rejecting “implied representation” theory based on assumption that, under that theory, card-use represented not only an intent, but also the ability, to repay); In re Briese, 196 B.R. at 448-50 (rejecting “implied representation” of intent and ability to pay theory for reasons similar to those expressed by Judge Duhé, but holding that, in using card, debtor makes express representation — a “promise to pay for the credit ad-vaneed”); Chase Manhattan Bank, N.A. v. Ford (Matter of Ford), 186 B.R. 312, 317 (Bankr.N.D.Ga.1995) (criticizing “ability-implying prong” of “implied representation” theory).
Even if card-use could be understood as a representation of not only an intent to repay, but also the ability to do so, the latter is not actionable under § 523(a)(2)(A). It exempts from discharge “any debt ... for money ... to the extent obtained by ... false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor’s ... financial condition ”. 11 U.S.C. § 523(a)(2)(A) (emphasis added).
Accordingly, the representation element is properly confined to encompassing only a statement of intent to repay.[5] This makes consideration of the ability to pay but one of many factors relevant to whether the representation was false and made with the subjective intent to deceive.[6]
*227 In this light, the “implied representation” theory does not have the undesirable consequence of making the debtor the guarantor of her financial condition. See Briese, 196 B.R. at 450 & n. 16 (“implied representation” is inappropriate, because debtor’s card-use “constitutes an actual representation of future performance”, “namely, the promise to pay for the credit advanced”; when ability to pay is not treated as part of the representation made with card-use, there is no “risk that the debtor becomes the guarantor of his or her financial condition”).
C.
Judge Dennis concludes correctly, in my opinion, that, each time she used her AT&T card, Mercer made a representation of an intent to repay. We part ways, however, because he would affirm the discharge on the basis that AT&T failed to prove it actually and justifiably relied on such representations.
Judge Dennis agrees with Judge Duhé that a credit card issuer cannot justifiably rely on any representation made by a cardholder if the card was pre-approved and, prior to card-issuance, the issuer obtained no direct financial information from the debtor. But, in his view, the creditor’s initial assumption of risk does not prevent it from justifiably relying on future representations if the debtor has established a history of prompt payment. Nevertheless, he concludes, as a matter of law, that, because AT&T received no direct financial information from Mercer prior to card-issuance, but instead based its decision to issue the card on the credit bureau screening process, AT&T assumed the risk that Mercer would not repay the charges, and could not justifiably rely on her implied promises to repay loans incurred through her card-use. The “justifiable rebanee” standard applied by Judge Dennis is far more stringent than that by Field, which, as Judge Duhé notes, does not require an investigation. See La Capitol Fed. Credit Union v. Melancon (In re Melancon), 223 B.R. 300, 328-29 (Bankr.M.D.La.1998) (requiring credit card issuer to demonstrate that it examined cardholder’s credit history before issuing card impermissibly contradicts Restatement rule adopted in Field).
In adopting the justifiable reliance standard, Field “look[ed] to the concept of ‘actual fraud’ as it was understood in 1978 when that language was added to § 523(a)(2)(A)”, as reflected in “the most widely accepted distibation of the common law of torts”: the Restatement (Seoond) of ToRts (1976). 516 U.S. at 70, 116 S.Ct. 437. Under the Restatement, “a person is justified in relying on a representation of fact ‘although he might have ascertained the falsity of the representation had he made an investigation’ ”. Id. (quoting Restatement (Second) of Toets, § 540). The Court cited the Restatement’s illustration that “a buyer’s reliance on th[e] actual representation [of a seller of land who says it is free of encumbrances] is justifiable, even if he could have ‘walk[ed] across the street to the office of the register of deeds in the courthouse’ and easily have learned of an unsatisfied mortgage”. Id. (quoting Restatement (Second) of Torts, § 540).
Furthermore, Field pointed out that “contributory negligence is no bar to recovery because fraudulent misrepresentation is an intentional tort”. Id. (emphasis added). Although “^justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case”, id. at 71, 116 S.Ct. 437, this does not mean that, simply because AT&T is a large corporation and has the ability to obtain financial information from the debtor, it cannot justifiably rely on her representation of an intent to repay the charges she incurred each time she used her card.
Field’s quotations from other tort treatises indicate clearly that the justifiable reliance standard Judge Dennis would impose is not consistent with the Court’s view of the scope of that standard. For example, 1 F. Haeper & F. James, Law of *228 ToRts § 7.12, pp. 581-83 (1956), quoted in Field, states:
[T]he plaintiff is entitled to rely upon representations of fact of such a character as to require some kind of investigation or examination on his part to discover their falsity, and a defendant who has been guilty of conscious misrepresentation can not offer as a defense the plaintiffs failure to make the investigation or examination to verify the same[.]
Id. at 72, 116 S.Ct. 437 (emphasis added).
Thus, even assuming AT&T could have obtained financial information directly from Mercer prior to issuing her the card, that does not preclude finding it was justified in relying on the information it obtained, which raised no “red flag” requiring further investigation. Moreover, as hereinafter discussed, the record does not support Judge Dennis’ statement that the credit bureau information obtained by AT&T prior to card-issuance “included no information as to Mercer’s current financial condition, solvency or ability to repay the loans contemplated”. (Emphasis added.)
At trial, an AT&T bankruptcy specialist testified that the screening process began six to seven months prior to AT&T’s solicitation to Mercer. In the first screening, the credit bureau produced a list of prospects based on criteria specified by AT&T, including total revolving debt, delinquencies, bankruptcies, judgments, utilization of existing credit, and historical delinquency periods over 60-90 days. The credit bureau determined a risk score (“FICO” score) for each prospect. The FICO score is a credit bureau model, developed by Fair Isaacs Co., which predicts the probability of an account being delinquent for 60-90 days or more within a one-year period. The maximum possible FICO score is 900; the lowest, 0. AT&T requires a minimum score of 680 as a condition for solicitation. Mercer’s was 735, which AT&T’s bankruptcy specialist evaluated as “very good”.
The list of prospects derived from the initial screening was then referred to an outside vendor. It eliminated prospects who had requested not to be solicited, duplicates, and prospects located in high fraud areas. The list was then matched against internal risk and scoring models used by AT&T; the list of prospects retained after that process was then returned to the credit bureau for a second screening to ensure there had been no changes in a prospect’s credit standing or credit history since the first screening.
The prospects who survived this second screening (including Mercer) received an offer for a pre-approved credit card, as AT&T is required to do, according to AT&T’s representative, under the Fair Credit Reporting Act. When Mercer accepted the offer, AT&T checked the information she supplied on the acceptance form to ensure it matched the information in its database. Then, a third credit bureau screening was performed to determine whether there had been any deterioration in credit history, in which case AT&T could either withdraw the offer or offer a lower line of credit.
In the light of that testimony, it is simply inaccurate to say AT&T had no information about Mercer’s ability to pay when it issued her a credit card.
Affirmance for the reasons stated by Judge Dennis is also inappropriate because, although the bankruptcy court correctly stated the applicable justifiable reb-anee standard, 220 B.R. at 323, it did not correctly apply it in determining AT&T did not actually or justifiably rely on any representations by Mercer. It held that, even assuming AT&T actually relied on any representations by Mercer, such reliance was not justifiable “in light of the incomplete nature of the credit information obtained by AT&T”. Id. at 327. The bankruptcy court suggested that, “[i]f AT&T does not want its cardholders to use cash advances for gambling purposes and wants such uses to be non-dischargeable, why not put a specific restriction on this *229 use in the cardholder agreement”. Id. at 328. During the trial, the bankruptcy judge suggested a number of questions AT&T should have asked Mercer before issuing her a credit card.[7] The court’s opinion and remarks reflect it imposed a much higher standard than justifiable reliance.
Instead, whether AT&T actually and justifiably relied on Mercer’s representations of intent to pay through her card-use is a question of fact. See Coston v. Bank of Malvern (Matter of Coston), 991 F.2d 257, 260 (5th Cir.1993) (en banc) (pre-Field case holding that reasonable reliance is question of fact). The bankruptcy court, applying the correct legal standard, should make that determination on remand.
Judge Dennis further concludes that nothing in AT&T’s experience with Mercer as a cardholder, subsequent to card-issuance, could justify a belief it had acquired a more substantial basis for its reliance upon her representations than it had when it issued the card. In support, he cites the following factors:
(1) fourteen of Mercer’s transactions were cash loans, several of which were made within a casino; (2) Mercer borrowed the maximum cash advance amount within thirty one days after receipt of the card; (3) Mercer had developed no history of payment or good standing with [AT&T] (Mercer had only made one payment of $25); [and] (4) nineteen days after issuance, [AT&T]’s own computer had red-flagged the use of Mercer’s credit card for excessive transactions.
Judge Dennis states that he does not find that the cited “factors caused AT&T’s reliance to be unjustified, but rather, that they do not make AT&T’s otherwise unjustified reliance justifiable”. AT&T does not, however, rely on any of the factors cited by Judge Dennis to demonstrate justifiable reliance. In any event, as hereinafter discussed, none of the cited factors supports a conclusion that AT&T did not actually or justifiably rely on Mercer’s representation, each time she used the card, that she intended to repay the charge incurred.
1. Fourteen transactions were cash loans, several of which were made within a casino. Although Mercer used the card to obtain 14 cash advances, only four (three on 23 November and one on 24 November, totaling approximately $1350) could be identified as occurring within a casino; nine (one on 28 November, three on 1 December, three on 10 December, and two on 11 December, totaling approximately $1300) are shown as having been obtained from an automatic teller machine at Peoples Bank, 676 Bayview, Biloxi, Mississippi; and one ($81 on 28 November) is shown as having been obtained from “STB SO. MISSIS”, at 854 Howard, Biloxi, Mississippi.
In any event, the fact that some of the cash advances were obtained at a casino is irrelevant in determining whether AT&T justifiably relied on Mercer’s representation that she intended to repay those loans. In the first place, the billing statement reflects that, although the advances were obtained by Mercer at the casino on 23 and 24 November, they were not posted until 27 November. As AT&T’s representative explained at trial, the date a transaction is posted to a cardholder’s account is *230 the date AT&T receives an electronic transfer notification from the clearing bank. There was no evidence that AT&T had the ability to instantaneously determine, at the time Mercer inserted her card into the ATM, that she was in a casino.
Moreover, there is no basis for, as a matter of law, treating cash advances obtained at casinos differently from cash advances obtained at other locations, such as banks or stores. Although Mercer testified that she used all of the cash advances obtained from AT&T for gambling, she obtained many of them at a bank rather than a casino. Moreover, the trial testimony established that AT&T has no control over ATM locations and is not affiliated with the entity which operated the casino ATM from which Mercer obtained cash advances.
The record contains no empirical or other evidence to support a rule precluding credit card issuers from justifiably relying on a cardholder’s promise to repay a cash advance simply because it was obtained within a casino.[8] Common sense suggests that not everyone who uses a credit card to obtain a cash advance at a casino does so in order to obtain money for gambling, or does so because she is losing and has no other source of funds with which to gamble. For example, if given a choice, some might consider it safer or more convenient to enter a casino to obtain cash, rather than do so at an ATM outside a bank, where there is no security and far greater potential for being robbed. Or, someone might be in a casino hotel because a convention is being held there or entertainment provided and, without using it for gambling, obtain a cash advance at an ATM in the casino to use for various monetary needs, such as dining. In short, obtaining cash from such an ATM does not automatically translate into that cash being used for gambling.
2. Mercer borrowed the maximum cash advance amount within 31 days after receipt of the card. This factor supports, rather than detracts from, finding justifiable reliance. Mercer used her available credit within the first billing cycle, before she received her first statement, giving AT&T no opportunity to evaluate her creditworthiness based on a history with it. Up until 11 December, the last day Mercer used the card, when she exceeded her $3,000 credit limit by approximately $186, her card-use was within the terms of the cardmember agreement. By using the card, she signified her acceptance of the terms of that agreement, including the term which required her to repay AT&T. The AT&T representative 'testified that, as long as a cardholder is using the card in accordance with the terms of the card-member agreement, AT&T is obligated to honor it.
8. Mercer had developed no history of payment or good standing with AT&T. As stated, Mercer exhausted her credit limit during the first billing cycle. Requiring that a cardholder have a history of timely payments before the issuer can justifiably rely on the cardholder’s representation of an intent to pay would result in the discharge of all credit card debt incurred by cardholders within at least the first month of use. Such a rule would encourage irresponsible and dishonest debtors to “max *231 out” their credit limits within the first billing cycle in order to preclude nondis-chargeability. It could also have the unintended consequence of spurring credit card issuers to establish such low credit limits that credit cards would serve no useful purpose to many card users.
A Nineteen days after issuance, AT&T’s own computer had red-flagged the use of Mercer’s credit card for excessive transactions.[9]
This factor is not particularly relevant. AT&T’s representative testified that: the account was reviewed by an AT&T employee, who determined that the transactions were not egregiously excessive and cleared Mercer’s account for further use; and, because the charges were within the terms of the cardmember agreement, AT&T was obligated to honor it. Reliance on this factor could encourage prudent credit card companies to cancel cards when cardholders use them frequently within the first billing cycle, regardless of whether such use did not exceed the cardholder’s credit limit.
D.
Based on the foregoing reasons, this case should be remanded to the bankruptcy court. Continuing to use § 523(a)(2)(A) actual fraud as the template, the following considerations for each of its five elements should come into play. Again, the five elements for such actual fraud are: (1) the debtor made representations; (2) when made, she knew they were false; (3) they were made with the intent to deceive the creditor; (4) it actually and justifiably relied on them; and (5) it sustained a loss as a proximate result of them.
For the first element, I would hold that, on each occasion Mercer used her AT&T credit card to make a purchase or obtain a cash advance, she expressly represented to AT&T her intent to repay the amount charged, in accordance with the terms of the cardholder agreement, by at least making the required minimum payment.
For the second and third elements, the bankruptcy court did not consider whether Mercer’s representations were false when made, or whether she made them with the subjective intent to deceive AT&T. For such factual determinations, all of the facts and circumstances surrounding Mercer’s card-use should, of course, be considered. Because a debtor rarely will admit credit card debt is incurred with the intention of not repaying it, the bankruptcy court should consider objective evidence of her state of mind.[10] I consider especially relevant her testimony that: when she used the AT&T card, she did not have enough income from her employment to pay all of her living expenses and make the minimum payments on all of her credit cards; and she intended to use gambling winnings to meet those expenses.[11]
For the fourth element, and as stated, the bankruptcy court applied an incorrect legal standard in finding AT&T did not actually and justifiably rely on any representations by Mercer. I would use the *232 standard of justifiable reliance applied in the Ninth Circuit: “the credit card issuer justifiably relies on a representation of intent to repay as long as the account is not in default and any initial investigations into a credit report do not raise red flags that would make rebanee unjustifiable”. In re Anastas, 94 F.3d at 1286 (emphasis added).[12]
That standard is appropriate because it “recognizes the unique nature of credit card transactions, the ability of a cardholder to mask an actual financial condition by making minimum payments from whatever sources, and the credit card issuer’s lack of access to the cardholder’s present financial condition at the point of each transaction”. See Searle, 223 B.R. at 391 (adopting Ninth Circuit’s justifiable rebanee standard). Facts relevant to that inquiry include: (1) AT&T’s decision to offer Mercer a pre-approved credit card was based on an examination of her credit history — • twice before she accepted the offer, and again after she accepted the offer and before it sent a card to her; (2) the terms of the eardmember agreement, which provided that Mercer’s card-use signified her acceptance of those terms, including the requirement that she repay the charges incurred, by at least making the minimum monthly payments; and (3) Mercer’s exhausting her available credit limit within the first billing cycle, within the scope of the eardmember agreement and before AT&T had any reason to suspect that she would not repay the charges.
Finally, for the fifth element, I would hold that AT&T’s loss (the unpaid charges) was proximately caused by its reliance on Mercer’s promise, each time she used the card, to repay the charge incurred.[13]
For the foregoing reasons, I respectfuby dissent and urge en banc consideration of this quite important case.

. See, e.g., Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert), 141 F.3d 277, 281 (6th Cir.) (use of credit card is implied representation of intent, but not ability, to repay), cert. denied, 525 U.S. 978, 119 S.Ct. 438, 142 L.Ed.2d 357 (1998); Anastas v. American Sav. Bank (In re Anastas), 94 F.3d 1280, 1285 (9th Cir.1996) (credit card transaction is unilateral contract between cardholder and issuer consisting of cardholder’s promise to repay and issuer’s performance by reimbursing merchant who accepted credit card in payment; use of card is representation of intent, but not ability, to repay); Citibank (S.D.), N.A. v. Eashai (In re Eashai), 87 F.3d 1082, 1088 (9th Cir.1996) (adopting 12 non-exclusive factors for determining whether debtor had subjective intent to deceive); Manufacturer's Hanover Trust Co. v. Ward (In re Ward), 857 F.2d 1082, 1085 (6th Cir.1988) (unless credit card issuer conducts credit check before issuing card, it assumes risk debtor will fail to pay for subsequent charges); First Nat’l Bank of Mobile v. Roddenberry, 701 F.2d 927, 932-33 (11th Cir. 1983) (concealment of inability to pay not actionable under Bankruptcy Act predecessor to § 523(a)(2)(A); credit card issuer assumes risk of non-payment until issuer unconditionally revokes cardholder’s right to further possession and use of card); Universal Card Servs. v. Pickett (In re Pickett), 234 B.R. 748, 755 (Bankr.W.D.Mo.1999) (use of credit card is express representation of both intent and ability to repay charge); AT&T Universal Card Servs. Corp. v. Reynolds (In re Reynolds), 221 B.R. 828, 837 (Bankr.N.D.Ala.1998) (use of credit card is promise to pay in future, not implied representation of present intent and actual ability to pay); AT&T Universal Card Servs. v. Alvi (In re Alvi), 191 B.R. 724, 726 (Bankr.N.D.Ill.1996) ("use of a credit card, in itself, does not constitute representation or statement which is capable of being true or false” (emphasis added)); GM Card v. Cox (In re Cox), 182 B.R. 626, 636 (Bankr.D.Mass.1995) (§ 523(a)(2)(A) does not encompass "implied misrepresentation of intent-to pay when both the representation and the absence of intent to pay must be based upon inference”).

. See, e.g., East v. AT&T Universal Card Servs. Corp., 1999 WL 425886, at *5 (N.D.Tex.1999) (debtor’s subjective fraudulent intent may "be inferred from objective facts suggesting ... debtor knew, or should have known, at the time the credit card was used, that the debtor was insolvent and lacked the ability to repay the charge”); AT&T Universal Card Servs. v. McLeroy (In re McLeroy), 237 B.R. 901, 903-05 (Bankr.N.D.Miss.1999) (use of credit card was representation that debtor would honor cardmember agreement; totality of circumstances, including 12 objective factors, used to determine whether debtor had fraudulent intent); Universal Card Servs. Corp. v. Akins (In re Akins), 235 B.R. 866, 872-74 (Bankr.W.D.Tex.1999) (applying "commercial entrapment” theory, credit card debt discharge-able because issuer’s extension of credit was result of its own negligent lending practices and industry’s negligent use of faulty FICO (risk) score system); La Capitol Fed. Credit Union v. Melancon (In re Melancon), 223 B.R. 300, 311, 324, 329-32 (Bankr.M.D.La.1998) ("[wjhen the card holder inserts the card into an ATM, he is, in one step, asking for a loan and promising to repay it if it is obtained”; "inability to pay coupled with proof of the debtor’s knowledge of inability to pay is suffi *223 cient to establish fraud”; although creditor has no duty to investigate, creditor who lends money in a casino cannot justifiably rely on debtor’s promise to repay); Sears, Roebuck & Co. v. Hernandez (In re Hernandez), 208 B.R. 872, 877 (Bankr.W.D.Tex. 1997) (”[p]assively extending credit in itself is not reliance ... nor can the court assume that a creditor relied on any alleged representation”); Household Credit Servs., Inc. v. Walters, 208 B.R. 651, 654 (Bankr.W.D.La.1997) (use of credit card is implied representation regarding repayment; if issuer justified in relying on debtor’s creditworthiness when card issued, reliance thereafter is presumptively justifiable unless some event occurs to rebut that presumption); Bank One Columbus, N.A. v. McDaniel (In re McDaniel), 202 B.R. 74, 78 (Bankr.N.D.Tex.1996) ("use of a credit card to incur debt in a typical credit card transaction involves no representation, express or implied”, and "creditor cannot sit back and do nothing and still meet the standard for actual and justifiable reliance when it had an opportunity to make an adequate examination or investigation”); AT&T Universal Card Servs. v. Samani (In re Samani), 192 B.R. 877, 879-80 (Bankr.S.D.Tex.1996) (creditor cannot establish fraud based on implied representation of intent and ability to pay based on mere use of credit card; instead, court considers objective totality of circumstances; reliance by creditor justified based on debtors’ prior sporadic payment of at least minimum payment due); First Deposit Credit Servs. Corp. v. Preece (In re Preece), 125 B.R. 474, 477 (Bankr.W.D.Tex.1991) (use of credit card is implied representation of present intention and ability to repay); City Nat’l Bank of Baton Rouge v. Holston (In re Holston), 47 B.R. 103, 109 (Bankr.M.D.La.1985) (credit card debt incurred prior to notification that account was closed is dischargeable, but portion occurred thereafter non-dischargeable); Central Bank v. Kramer (In re Kramer), 38 B.R. 80, 82 (Bankr.W.D.La.1984) (creditor proves false misrepresentation "if it can show that the defendant purchased goods by means of the credit card and that the purchases were made at a time when the debtor either did not have the means to or did not have the intent to pay for the goods”); Ranier Bank v. Poteet (In re Poteet), 12 B.R. 565, 567 (Bankr.N.D.Tex.1981) (purchase of merchandise by credit card is implied representation to issuer of card that buyer has means and intention to pay for purchase).

. The predecessor to § 523(a)(2)(A) did not include actual fraud as a basis for nondis-chargeability. Davison-Paxon Co. v. Caldwell, 115 F.2d 189, 191-92 (5th Cir.1940), cert. denied, 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941), held that a debt created by fraud (obtaining credit through concealment of insolvency and present inability to pay) was dischargeable because nondischargeability for false pretenses or representations under the Bankruptcy Act required proof of an overt false pretense or misrepresentation; concealment was insufficient. As noted in Sears, Roebuck & Co. v. Boydston (Matter of Boydston), 520 F.2d 1098, 1101 (5th Cir.1975), ”[t]he rationale underlying Davison-Paxon has been severely eroded in the modern world of credit transactions and the decision has been the subject of much criticism”. Nevertheless, it has not been overruled, and has caused considerable confusion among the bankruptcy courts in our circuit. Our en banc court should resolve that confusion. See, e.g., In re Melancon, 223 B.R. at 312-15 (discussing Davison-Paxon at length and concluding that it is obsolete due to Bankruptcy Code’s addition of actual fraud and Supreme Court’s adoption of common-law interpretation); In re Samani, 192 B.R. at 879 (allowing creditor to establish fraud based on implied representation of intent and ability to repay based on credit card use would directly contravene Davison-Paxon); ITT Fin. Servs. v. Hulbert (In re Hulbert), 150 B.R. 169, 175 (Bankr.S.D.Tex.1993) (concluding that Code’s addition of actual fraud has no effect on validity of Davison-Paxon); In re Holston, 47 B.R. at 107 (unnecessary to decide whether Davison-Paxon is still good law, because Code’s addition of actual fraud as nondischargeability ground expands scope of nondischargeable *224 debts to include those arising from intentional concealment or omission); Louisiana Nat’l Bank of Baton Rouge v. Talbot (In re Talbot), 16 B.R. 50, 54 (Bankr.M.D.La.1981) (bound by Davison-Paxon); In re Poteet, 12 B.R. at 568 (rejecting Davison-Paxon requirements as not relevant to credit card transactions).

. For criticism of the assumption of the risk theory, see AT&T Universal Card. Servs. Corp. v. Searle, 223 B.R. 384, 389 (D.Mass.1998) (theory "advantages the dishonest and deceptive debtor”); In re Briese, 196 B.R. at 449 (theory "unsatisfactory, primarily because dishonest debtors may manipulate its mechanical distinction between debts incurred before and after credit privileges are revoked”; "creditor does not 'assume the risk' that the debtor is dishonest”); Chase Manhattan Bank, N.A. v. Ford (Matter of Ford), 186 B.R. 312, 318 n. 8 (Bankr.N.D.Ga.1995) ("many courts have criticized the Eleventh Circuit's approach as going to an extreme, tipping the scales so far in favor of debtors that very few credit card debts will qualify as nondischargeable”); In re Cox, 182 B.R. at 634 (theory "too judgmental to support a court decision purporting to apply a statute”); In re Preece, 125 B.R. at 477 (theory "places credit card issuers in a virtually impossible position with respect to credit card charges made prior to revocation of the card” (internal quotation marks and citation omitted)).

. See In re Rembert, 141 F.3d at 281 ("use of a credit card represents either an actual or implied intent to repay the debt incurred"); In re Anastas, 94 F.3d at 1285 ("[w]hen the card holder uses his credit card, he makes a representation that he intends to repay the debt”); Chevy Chase Bank FSB v. Kukuk (In re Kukuk), 225 B.R. 778, 785 (10th Cir. BAP 1998) ("use of a credit card creates an implied representation that the debtor intends to repay the debt incurred thereby, but does not create any representation regarding the debtor’s ability to repay the debt”); American Express Travel Related Servs. Co. v. Christensen (In re Christensen), 193 B.R. 863, 866 (N.D.Ill.1996) ("debtor’s use of a credit card is a representation that he or she will pay off the debt at some point in the future”); In re Melancon, 223 B.R. at 311 (”[w]hen the card holder inserts the card into an ATM, he is, in one step, asking for a loan and promising to repay it if it is obtained”); In re Reynolds, 221 B.R. at 837 (debtor’s use of credit card is representation of "promise to pay under terms of the debtor's contract with the credit card issuer”); In re Briese, 196 B.R. at 450 (”[a]l-though the debtor may not speak directly to the credit card issuer when making a purchase or obtaining a cash advance, there is little doubt that the debtor makes a representation — namely, the promise to pay for the credit advanced”); Chase Manhattan Bank v. Murphy (In re Murphy), 190 B.R. 327, 332 (Bankr.N.D.Ill.1995) ("the use of a credit card is a representation regarding future action”).

. See, e.g., In re Eashai, 87 F.3d at 1091 (considering debtor’s financial condition, including fact that monthly expenses exceeded income when credit card charges made, as one factor for inferring intent to defraud); In re Reynolds, 221 B.R. at 839 (debtor's "reliance upon ... speculative financial arrangements appears to be a reckless disregard of the truth of his ability to make the minimum monthly payments”); AT&T Universal Card Servs. Corp. v. Pakdaman, 210 B.R. 886, 889 (D.Mass.1997) ("A debtor's ability to repay at the time he or she incurs indebtedness may of course be circumstantial evidence on the issue of intent, but it is only one factor.”); In re Murphy, 190 B.R. at 332 n. 6 (ability to pay "is merely one factor to be considered in determining whether the debtor intended to repay”, but ”[a]lone ... does not establish fraudulent intent”); Household Credit Servs., Inc. v. Jacobs (In re Jacobs), 196 B.R. 429, 434 (Bankr.N.D.Ind.1996) (relying on fact that, when debtor incurred charges, debtor was unable to pay monthly payments on preexisting debts and monthly income was less than expenses as factor supporting conclusion that debtor subjectively intended to defraud creditor); Matter of Ford, 186 B.R. at 320 ("debtor’s inability to pay the debt at the time that he incurred it may present indicia of an intent to defraud”).

. The bankruptcy court asked AT&T’s representative why AT&T had not asked Mercer where she worked, how many children she had, and whether she was married; and why it did not prohibit cardholders’ use of ATM machines at casinos. At the conclusion of the adversary proceeding, the court suggested that, in addition to relying on credit bureau information and FICO scores, credit card companies could ask whether, among other things, the debtor: has any problem with gambling; owes any gambling debts; has had any gambling losses or winnings over the last several years; has other credit cards and, if so, the balance due; has a savings account and, if so, the balance; has a second job and, if so, why. The court suggested further that credit card companies should be required to exercise due diligence.

. Some courts have criticized the credit card industry for allowing debtors to use credit cards at casinos, and have held that credit card issuers cannot justifiably rely on representations of intent to pay when their cards are used to obtain cash advances at casinos. See, e.g., In re Melancon, 223 B.R. at 329 & nn. 42, 43 (noting “obvious stupidity of an institutional policy that sanctions the decision to lend money in a casino to borrowers who gamble and are willing to do so with somebody else’s money”; "[i]f a lender allows a holder to borrow money inside a casino, then the lender must be charged with two bits of information: the money will be used for gambling, and either the borrower has been losing or he has no money of his own with which to gamble”; "[a] creditor that lends money inside a casino is not justifiably relying on anything”); In re Reynolds, 221 B.R. at 840 ("[cjredit card issuers which allow cash advances on ATMs in gambling casinos are on notice their customers may use the money to gamble, and presumably that some gamblers may be poor credit risks”).

. The bankruptcy court misstated that Mercer's account was flagged for excessive transactions nine days after issuance. See AT&T Universal Card Servs. v. Mercer (In re Mercer), 220 B.R. 315, 320 (Bankr.S.D.Miss.1998) (stating AT&T representative testified Mercer's account was flagged for excessive use on 19 November 1995).

. See, e.g., In re Eashai, 87 F.3d at 1090 (“Since a debtor will rarely admit to his fraudulent intentions, the creditor must rely on [objective factors] to establish the subjective intent of the debtor through circumstantial evidence.”); Citibank (S.D.), N.A. v. Michel, 220 B.R. 603, 606 (N.D.Ill.1998) ("Obviously the court must consider objective evidence that is probative of the debt- or’s intent to repay in addition to considering the debtor's demeanor, but the ultimate inquiry still seeks to determine the debtor's subjective intent”); In re Briese, 196 B.R. at 451 (because it is “difficult, if not impossible, for a plaintiff to present direct evidence of a debtor’s intent to deceive!,] • ■ • courts may legitimately utilize circumstantial evidence to ascertain debtor’s intent”).

.See In re Melancon, 223 B.R. at 336-41 (discussing at length whether gamblers who hope to repay debts with gambling winnings have requisite intent to repay, and concluding that, although debtor “like all other gamblers, may have hoped that she would win a lot of *232 money, ... [she] never intended to repay the cash advances”); In re Jacobs, 196 B.R. at 434 (subjective intent to deceive established by proof that debtors obtained cash advances and purchases when they were unable to pay monthly payments on pre-existing debts and when their monthly income was less than their monthly expenses; they were in default on other debts when they incurred debts at issue, thus putting themselves in position of insolvence; and they had in excess of $45,000 in secured debt when they began to incur debt at issue); In re Preece, 125 B.R. at 478 (debtor’s professed intention to repay cash advances charged to credit card not held in good faith because he knew he did not have ability to repay them; ”[a] debtor cannot ignore the reality of his financial situation and still maintain that he has a 'good faith intent' to repay”).

. Judge Dennis criticizes my quotation from In re Anastas for the Ninth Circuit’s justifiable reliance standard, stating it is dictum and "not a complete or comprehensive statement of the Ninth Circuit's jurisprudence on justifiable reliance”. In stating the standard, In re Anastas cited In re Eashai, 87 F.3d at 1091, in which the discussion of justifiable reliance was not dictum. Moreover, in a subsequent decision, the Ninth Circuit quoted that same language from In re Anastas in describing its standard. See American Express Travel Related Servs. Co. v. Hashemi (In re Hashemi), 104 F.3d 1122, 1126 (9th Cir.1996) (quoting In re Anastas, 94 F.3d at 1286). In stating that I would adopt this standard, is not my intention to provide a complete or comprehensive statement of the Ninth Circuit’s jurisprudence on justifiable reliance. Obviously, if a cardholder has established a history of payments with the creditor, justifiable reliance will be easier to prove. But, I do not interpret the Ninth Circuit’s jurisprudence to require such a history; and, as discussed supra, I would not hold that the absence of such a history precludes finding justifiable reliance.

. See Pakdaman, 210 B.R. at 890 ("issuer's extension of credit constitutes both actual reliance and damages”); In re Melancon, 223 B.R. at 326 (in using credit card, debtor represents intent to repay; representation is made with intent to cause issuer to provide credit; and representation is cause in fact of issuer's decision to provide credit); AT&T Universal Card Servs. Corp. v. Wong (In re Wong), 207 B.R. 822, 832 (Bankr.E.D.Pa.1997) (creditor proved it sustained loss as proximate result of debtor’s representations by establishing that, as direct result of debt- or’s use of credit card, debtor incurred debt that has not been paid).