**In re Claudine PANTELIAS, Debtor.**

**Chase Manhattan Bank, Plaintiff,**

v.

**Claudine Pantelias, Defendant.**

**Bankruptcy No. 00–12573.**
**Adversary No. 00–1167.**

United States Bankruptcy Court,
E.D. Tennessee,
Southern Division.

Aug. 13, 2001.

Brent James, Grisham, Knight & Hooper, Chattanooga, Tennessee, Attorneys for Plaintiff.

Shannon L. Clark, Chattanooga, Tennessee, Attorney for Defendant.

## *MEMORANDUM OPINION*

R. THOMAS STINNETT, Bankruptcy Judge.

Chase Manhattan Bank ("Chase") commenced this adversary proceeding to determine the dischargeability of a portion of the credit card debt owed to it by the debtor, Claudine Pantelias. Chase issued the debtor a credit card many years before the debtor's bankruptcy, but within three months before bankruptcy, she charged several thousand dollars. Chase alleges that the debtor charged about $4,900 when she did not have the intent to pay Chase, and as a result, the debt cannot be discharged in the debtor's bankruptcy case. The debtor denies this and alleges that if she wins this dispute, then she should recover costs and attorney's fees from Chase because its position was not substantially justified. 11 U.S.C. § 523(d).

Chase's complaint relied on Bankruptcy Code § 523(a)(2)(A) and § 523(a)(6), but the trial briefs completely ignored § 523(a)(6), and the case was tried solely under § 523(a)(2)(A). Thus, the only relevant provision is § 523(a)(2)(A), which provides:

(a) A discharge ... does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A).

The charges made by the debtor fall into three categories: (1) purchases from merchants, (2) cash from automatic teller machines, and (3) checks written on the credit card account. The debtor does not dispute that all of these were extensions of credit by Chase. The parties have focused their arguments on the question of intent. When the debtor made a particular charge, did she intend to repay Chase?

The debtor moved to this country in 1972. She was married for about six years and then single for about ten years. The debtor applied for and received the credit card from Chase in 1984 when she was not married.

In 1988, the debtor married again, to a man named Robinson. During the marriage to Mr. Robinson, the debtor accompanied him on visits to sell hearing aids. According to the debtor, Mr. Robinson made about $150,000 per year while they were together. During this time the debtor had about fifteen other credit cards, in addition to the card from Chase. She had no problem making the required minimum payments on those accounts until shortly before her bankruptcy petition.

The debtor and Mr. Robinson separated in 1996, and she filed suit for divorce. The divorce did not become final until May 2000. Between the separation and the divorce, the debtor did not receive any support payments from Mr. Robinson.

After she separated from Mr. Robinson, the debtor had some money left by her first husband. She used that money to pay bills, but it ran out when she had to pay her lawyer in the divorce case. After it ran out, her son would help her.

The debtor also operated a small dress shop, Claudine's Boutique, for about two years; she closed it in 1997 due to poor health.

The debtor testified that in October 1998 she began using cash advances on some credit cards to make payments on other credit cards. In May 1999 the debtor filed an income and expense statement in the divorce proceeding. According to this

statement, the debtor had no income, but she had expenses of about $2,500 per month. The expenses included $500 per month for payments on credit cards. At the time she was making some credit card payments by using other credit cards.

The debtor filed an amended statement with the state court in March 2000. The amended statement showed net income of about $750 per month and expenses of about $1,000 per month. The expenses included credit card payments of $400 per month. The debtor testified that she kept using the Chase card at the time even though she was going deeper in debt. She also continued to make some credit card payments by getting money on other credit cards.

The debtor testified that in the · 18 months before bankruptcy she made credit card payments with help from her son and with advances on other credit cards.

In May 2000, the debtor filed her bankruptcy petition with the accompanying schedules and statements. According to schedules I and J, the debtor had been employed by National Car Rental for 11 months before the bankruptcy, her net income was about $700 per month, and her expenses were about $1,300 per month.

Chase's attorney asked the debtor which of her other 15 credit cards were over the credit limit when she filed bankruptcy. The debtor first testified that all of them were over the credit limits. She then testified that she misunderstood the question; not everyone of them was over the credit limit before her bankruptcy.

Chase put into evidence the statements for the debtor's credit card account for the period from June 1998 through the debtor's bankruptcy filing in May 2000. The debtor's credit limit was $9,800 when the first of these statements was sent in July 1998. It was increased to $13,000 with the next statement, the one for July—August 1998. The statement for September—October 1998 increased it again to $13,700; it stayed at that level until the debtor's bankruptcy in May 2000.

Mr. Garcia, the witness from Chase, testified that Chase increases the credit limit periodically based on a review of the account history. The payment history is important to the decision on whether to increase the credit limit. This includes consideration of whether the account has been kept current and whether charges have ever exceeded the credit limit. The records in Mr. Garcia's possession did not show that the debtor requested the increases in the credit limit.

From his review of the records, Mr. Garcia concluded the debtor was a good customer even though she had several payment checks returned. He defined a good customer as one who makes regular monthly payments. The debtor's card was not cancelled because she failed to make payments. It was cancelled because she exceeded the credit limit.

Chase apparently decided in April 2000 to "emboss" the debtor's card. (Exhibit 7). Mr. Garcia explained that embossing a card means issuing a new card. He testified that a new card was going to be issued for some reason and that the records showed that the debtor was due a new card. In this regard, the first page of Exhibit 7 shows the card's expiration date as May 1. Mr. Garcia was questioned about the wisdom of issuing the debtor a new card. Mr. Garcia pointed out that the last billing date, April 12, had just passed. Chase had no way of knowing that the debtor would not make any more payments on the account. The court notes that the debtor had made the minimum monthly payments through March, but quite a few of them were late. The April

payment was the first one she completely missed.

The following table is taken from the credit card statements. It shows new charges the debtor made from mid-June 1998 through mid-April 2000. The new charges shown in the table do not include fees imposed by Chase for late payments, returned checks, or exceeding the credit limit.

| Statement Period | Due Date | New Charges | Balance |
|---|---|---|---|
| Jun. 11—Jul. 12, 1998 | Aug. 7, 1998 | 0 | 6874 |
| Jul. 13—Aug. 11, 1998 | Sep. 6, 1998 | 0 | 6713 |
| Aug. 12—Sep. 10, 1998 | Oct. 6, 1998 | 0 | 6656 |
| Sep. 11—Oct. 11, 1998 | Nov. 6, 1998 | 442 | 7236 |
| Oct. 12—Nov. 10, 1998 | Dec. 6, 1998 | 0 | 7098 |
| Nov. 11—Dec. 10, 1998 | Jan. 5, 1999 | 0 | 7539 |
| Dec. 11, 1998—Jan. 12, 1999 | Feb. 7, 1999 | 0 | 7079 |
| Jan. 13—Feb. 10, 1999 | Mar. 8, 1999 | 1000 | 8092 |
| Feb. 11—Mar. 10, 1999 | Apr. 5, 1999 | 242 | 8530 |
| Mar. 11—Apr. 11, 1999 | May 7, 1999 | 0 | 8781 |
| Apr. 12—May 11, 1999 | Jun. 6, 1999 | 0 | 8724 |
| May. 12—Jun. 9, 1999 | Jul. 5, 1999 | 0 | 8577 |
| Jun. 10—Jul. 12, 1999 | Aug. 6, 1999 | 100 | 8583 |
| Jul. 13—Aug. 10, 1999 | Sep. 5, 1999 | 0 | 8768 |
| Aug. 11—Sep. 12, 1999 | Oct. 8, 1999 | 0 | 8574 |
| Sep. 13—Oct. 11, 1999 | Nov. 5, 1999 | 0 | 8762 |
| Oct. 12—Nov. 9, 1999 | Dec. 5, 1999 | 0 | 8605 |
| Nov. 10—Dec. 9, 1999 | Jan. 4, 2000 | 0 | 8597 |
| Dec. 10, 1999—Jan. 11, 2000 | Feb. 6, 2000 | 0 | 8609 |
| Jan. 12—Feb. 9, 2000 | Mar. 6, 2000 | 1337 | 9952 |
| Feb. 10—Mar. 12, 2000 | Apr. 7, 2000 | 3492 | 13464 |
| Mar. 13—Apr. 11, 2000 | May 7, 2000 | 142 | 13930 |

The charges in September—October 1998 were eight balance transfer checks, the largest being $190. The $1,000 charge in January—February 1999 was a cash advance. The debtor testified that she used it to pay her lawyer in the divorce case. The charges in February—March 1999 were a restaurant charge of about $25, a disputed charge of $12 for a magazine subscription, and three balance transfer checks, the largest of which was $150. The $100 charge in June—July 1999 was a cash advance. Except for money she paid her lawyer, the debtor did not remember exactly how she spent cash advances.

The charges in January—February 2000 were:

| | |
|---|---|
| Big Lots | 855.10 |
| Big Lots | 19.47 |
| Food Lion | 141.59 |
| K–Mart | 214.41 |
| Rio Bravo | 18.22 |
| Bi–Lo | 59.29 |
| Racetrac | 16.50 |
| Golf Magazine | 12.00. |

The charges in February—March 2000 were:

| | | |
|---|---|---|
| FTNB | 1000.00 | |
| Wal–Mart | 325.85 | (total of two charges) |
| Bi–Lo | 201.65 | |
| K–Mart | 112.93 | |
| Target | 228.26 | |
| Big Lots | 182.66 | |
| Lowe's | 251.42 | |
| Rhodes Furn. | 659.05 | |
| Waccamaw | 219.11 | (total of two charges) |
| Ace Hdwe. | 67.88 | |
| Hwy. 58 Liquors | 93.69 | |
| Bi–Lo | 25.10 | |
| Rio Bravo | 9.20 | |

| | |
|---|---|
| Ocean Ave. Café | 5.75 |
| Mr. T's Place | 17.00 |
| CVS | 7.99 |
| Westside Grill | 17.34 |
| Jet | 20.00 |

The final charge of $141.50 in March—April 2000 was at Suddenly Slimmer Wraps.

The $855.10 charge at Big Lots was for a couch the debtor bought in mid-January 2000. The $659.05 charge at Rhodes was for a chair the debtor bought in early March 2000. The debtor sold both items shortly after she bought them. She explained the sales as follows. When she bought these items she thought there was a place where she could stay and establish her situation. But she was required to move because her landlord was selling the property where she rented. She did not have any place to store the property. As a result, she sold both of these items shortly after she bought them. She testified that she did not buy them to resell. She did not intend to have a yard sale of the items. She did not sell them through Claudine's Boutique because it had closed in 1997. She did not schedule the income from the sales in her bankruptcy case because she sold the items at a loss.

The debtor's testimony was unclear as to whether she actually had to move or when she moved. She stated that all of her addresses for the two years before bankruptcy were not listed in the statement of affairs filed with bankruptcy petition, but she gave them to her attorney. The debtor also testified as follows. At the end of 1999 she was living between the rental place in Chattanooga and her son's home in Georgia. She had to move to her son's home and could not move the furniture herself. In May 2000, when she filed her bankruptcy case, she was living in more than one place.

The debtor testified that she sold some of the items she bought at Waccamaw, Walmart, Lowe's, Target, and K–Mart. She denied that she was just buying and reselling. She said it was not her intent to do so. She further testified that she bought necessary items, not things to furnish a home. She did not buy a television or VCR at K–Mart. The debtor testified that she used the $1,000 from First Tennessee Bank (FTNB) to pay her divorce lawyer.

The debtor testified that she intended to pay her credit card debts with her alimony after the divorce. She wanted alimony, and she wanted the court to order her ex-husband to pay the credit card debts because he had sufficient income to pay them. The divorce complaint did not specifically request that he be required to pay the credit card debt, but it did ask for a reasonable amount of alimony and an equitable distribution of property. Exhibit 6, Prayer 3 & 4. The state court awarded her temporary alimony at $1,400 per month. It did not order her ex-husband to pay her credit card debts.

The debtor filed bankruptcy within a week after the divorce decree was entered. She did not list alimony in schedule I because she had not received any; she didn't have any in hand. She filed her first contempt complaint against her ex-husband to collect the alimony after she had filed bankruptcy.

The debtor testified that she did not consider bankruptcy until her divorce. Bankruptcy was mentioned by the state court judge, not before then. She found her bankruptcy attorney by looking in the telephone book and called her the day after the divorce. She knew nothing about bankruptcy before May 2000, the month of her filing. When the debtor filed bankruptcy, she owed more than $96,000 in credit card debt.

## DISCUSSION

■ As the court mentioned before, the primary question is whether the debtor intended to pay Chase at the time she made the charges in question. The Sixth Circuit and other courts have set out a number of factors that can help when attempting to determine the debtor's intent. *Rembert v. AT & T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 282 (6th Cir.1998). The factors are: (1) the length of time between the charges and the filing of bankruptcy, (2) whether the debtor consulted an attorney about bankruptcy before making the charges, (3) the number of charges made, (4) the amount of the charges, (5) the debtor's financial condition at the time of the charges (ability to pay), (6) whether the charges exceeded the credit limit, (7) whether the debtor made multiple charges on the same day, (8) whether the debtor was employed at the time of the charges, (9) the debtor's prospects for employment at the time of the charges, (10) the debtor's financial sophistication, (11) whether there was a sudden change in the debtor's buying habits, and (12) whether the purchases were made for luxuries or necessities. *Rembert*, 141 F.3d 277, note 3.

When the debtor made the charges in question she was employed, but she had a relatively huge amount of credit card debt that she could not possibly pay from her income. She could make the regular minimum payments only with financial help from her son and by using credit cards to pay other credit cards.

In the 18 months from July 1998 through December 1999, the debtor charged about $1,800 on the Chase card. From January through March 2000 she charged almost $5,000 on the Chase card, and then she filed bankruptcy on May 23, 2000.

Creditors sometimes attempt to show that the debtor did not intend to pay the charges by proving that the debtor was already planning to file bankruptcy when the charges were made. That will not work in this case. The evidence does not show that the debtor intended to file bankruptcy at the time she made the charges. Indeed, the evidence shows that the debtor did not consider bankruptcy until the time of her divorce, when she realized that alimony or a divorce settlement would not allow her to pay the credit card debts.

The facts show an increase in purchases shortly before bankruptcy. The purchases were not entirely or mostly luxury items. At the time of the large purchases, the debtor thought she had a place where she could establish herself. The purchased items also were not the type of items that people usually buy to resell as a method of raising money. Furthermore, the evidence does not show that when the debtor made the purchases, she knew or suspected the divorce would not help her get out from under the mountain of credit card debt. The evidence suggests the debtor was expecting a change in her financial circumstances as a result of the divorce or other events, but it did not come out as she expected.

The debtor's testimony and other facts also left the court with an impression of the debtor's financial vision. First, the debtor generally did not think about liability for the entire amount of the credit card debts. The debtor was focused on making the required monthly payments. The court cannot say how the other credit card companies operated, but Chase apparently would let a large amount of debt accumulate and remain if the customer continued to make the required payments. The court is not critical of this method of operation. The point is that it fit with the attitude of this particular debtor; it allowed her to focus on the short term as her basic obligation. Second, the debtor did not think she would end up having to

pay the credit card debts herself. During the marriage, she relied on Mr. Robinson's income. She expected the same result from the divorce. She expected he would end up making the payments directly or she would receive sufficient alimony to solve the problem. When this did not happen, the debtor was forced to face her real financial situation, in particular almost $97,000 of credit card debt. Apparently, the state court judge made statements that helped the debtor to see the light. The debtor then realized the need to file bankruptcy.

■ Considering the objective facts, the court or the creditor may think the debtor's financial expectations at the time she made the charges were unrealistic. But that does not mean the debtor's expectations can be ignored; the court must determine the debtor's subjective intent— whether she in fact intended to pay the charges. Of course, the court must consider the degree to which the debtor's expectations were supported by the objective facts she knew—the less support, the more difficult it is for the court to believe the debtor had the intent to pay. The court finds that the debtor in this case intended to pay the charges, or at the least, she intended to continue paying her debt to Chase whether she ever paid it in full or not.

The facts in this case are more like the facts in cases that have held credit card debts to be dischargeable under § 523(a)(2)(A). *Providian Bancorp. v. Shartz (In re Shartz)*, 221 B.R. 397 (6th Cir. BAP 1998); *Huntington National Bank v. Lippert (In re Lippert)*, 206 B.R. 136 (Bankr.N.D.Ohio 1997); *Anastas v. American Savings Bank (In re Anastas)*, 94 F.3d 1280 (9th Cir.1996). The facts are less like the facts in cases that have excepted credit card debts from discharge under § 523(a)(2)(A). *American Express Travel Related Services Co. v. Hashemi*

*(In re Hashemi)*, 104 F.3d 1122 (9th Cir. 1996); *Chase Manhattan Bank v. Robinson (In re Robinson)*, 238 B.R. 681 (Bankr. N.D.Ohio 1999). The court will enter an order that the debt be discharged.

■ Having decided in the debtor's favor, the court must decide whether she should recover costs, including attorney's fees, under § 523(d). The statute allows fees to be recovered only if Chase's position was not substantially justified. 11 U.S.C. § 523(d). The evidence certainly justified Chase in bringing suit and continuing to trial. The debtor's pattern of spending, her financial condition at the time of the charges, and her sale of several of the items she bought, including the most expensive items, was enough to raise the suspicion that the debtor never intended to pay the charges. Furthermore, pre-trial investigation could not have dispelled Chase's suspicions as to the debtor's intent. This was a very close case with regard to whether the debtor intended to pay the charges at the time she made them. The court concludes that Chase's position was substantially justified, and therefore, the debtor cannot recover attorney's fees and costs. *Compare AT & T Universal Card Services Corp. v. Duplante (In re Duplante)*, 215 B.R. 444 (9th Cir. BAP 1997)(substantially justified); *Star Bank v. Stearns (In re Stearns)*, 241 B.R. 611 (Bankr.D.Minn.1999)(substantially justified); *and First Card v. Hunt (In re Hunt)*, 238 F.3d 1098 (9th Cir.2001)(not substantially justified); *Bank of America v. Miller (In re Miller)*, 250 B.R. 294 (Bankr.E.D.Ky.2000)(not substantially justified). The court will enter an order.

This memorandum constitutes the court's findings of fact and conclusions of law as required by *Fed. R. Bankr.P.* 7052.

### *ORDER*

In accordance with the court's Memorandum Opinion entered this date,

It is ORDERED that the debt owed by the defendant to Chase Manhattan Bank is dischargeable;

It is FURTHER ORDERED that the counterclaim of the defendant is DENIED; and

It is FURTHER ORDERED that this complaint is dismissed with each party bearing their own costs.